

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-18-00152-CR

---

GAVIN HEATH GILBERT, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 8th District Court
Hopkins County, Texas
Trial Court No. 1826694

---

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Stevens

O P I N I O N

A Hopkins County jury rejected Gavin Heath Gilbert's claim that he acted in self-defense and convicted him of the murder[1] of Tyrone Phelps.[2]  Based on the jury's verdict, Gilbert was assessed a punishment of fifty-five years' imprisonment.  On appeal, Gilbert contends that there was legally insufficient evidence (1) to support his conviction for murder and (2) to support the jury's rejection of his claim of self-defense.  Gilbert also contends that the trial court erred in (1) admitting evidence that improperly bolstered the testimony of one of the State's witnesses, (2) admitting a photograph of the victim in the hospital, (3) admitting a video recording of the victim's family during the punishment phase of the trial, (4) submitting a jury instruction on retreat, (5) failing to submit an instruction regarding the effect of self-defense on the lesser-included offense of manslaughter, and (6) failing to submit different manner and means of murder as separate charges.  Since we find there is legally sufficient evidence to support Gilbert's conviction and the jury's rejection of his self-defense claim and we find no trial court error on his jury charge and preserved evidentiary complaints, we affirm the trial court's judgment.

I.      The Evidence at Trial

        A.      The Testimony of Phelps' Friends

On the evening of December 17, 2017, Phelps and four of his friends, Larry, John, Jack, and Jim, took Larry's truck to purchase fourteen grams of marihuana from Gilbert.  Larry, John, Jack, and Jim gave generally consistent testimony about the events leading up to, and following,

---

[1]See TEX. PENAL CODE ANN. § 19.02(b) (West 2011).

[2]We refer to all persons who were minors when the offense was committed by pseudonyms. See TEX. R. APP. P. 9.10.

2

the incident. They testified that, two days before the incident, Gilbert sold Larry and John an amount of marihuana that he represented to be fourteen grams, which turned out to be only nine grams. Consequently, Phelps and his friends decided to bring digital scales to the December 17 transaction to weigh the marihuana. They also decided that, if Gilbert shorted them again, they would drive off with the marihuana without paying for it.

Larry and his friends pulled up and parked on the side of the road in front of Gilbert's house and waited as Gilbert walked down from his house.[3] Gilbert came to the driver's window and gave the marihuana to Larry, who weighed it on the scales. Instead of the fourteen grams agreed upon, the marihuana only weighed around nine grams. After informing Gilbert of the discrepancy, and a short verbal exchange, Larry hit the gas pedal and peeled out toward the road. Larry and his friends testified that no one had threatened Gilbert, yelled at him, pulled a weapon on him, or used the truck as a weapon during the incident.

At trial, the four young men all agreed that the truck sped up quickly, but several had differing memories regarding the initial movement of the truck. John thought the tires made a squealing sound. Larry testified that the truck spun out a bit and acknowledged that its back end slid to the left and could have hit Gilbert if he had not moved back. Jack acknowledged that the truck spun out, but did not think that it moved toward Gilbert.

The young men also testified that the truck then sped across the road. They heard Gilbert fire several gunshots, one after another. Then several bullets came through the back of the truck. Phelps screamed that he had been shot. They called 9-1-1 and were told to meet the ambulance at

---

[3]Aerial photographs show that Gilbert lived off a country road and that his house was set back several hundred feet from the road.

a fire station. On the way to the fire station, one of them threw the marihuana to the side of the road. When they got to the fire station, the young men quickly agreed to tell the police that they had been "free-styling" in the country and had passed close to someone, who then started shooting at them.

They first told this fabricated story to law enforcement because they were afraid and did not want to disclose the marihuana. But Larry told Lewis Tatum, the Hopkins County Sheriff, what really happened when he rode with Tatum to show him where the incident happened. Later on, the other young men also told law enforcement what really happened when confronted with the physical evidence.

The young men also testified that Larry had a deer rifle and a shotgun in his truck that night. The rifle was between the front seats with the barrel to the floor, and the shotgun was behind the back seat. The rifle may have been visible to Gilbert.

### B. Mason Gilbert's Testimony

Mason Gilbert, Gilbert's cousin, testified that, on the evening of December 17, he was visiting Gilbert's brother at their grandmother's house. Gilbert walked outside without saying anything. About thirty minutes later, Mason went to look for Gilbert when he did not answer his cell phone. When Mason went outside, Gilbert called him and explained that he had been robbed. Later, Gilbert revealed that, when he walked outside, he was going to sell marihuana to Larry and carried a gun in his pocket. Gilbert explained that, when he got to Larry's truck, Larry was driving, and Jim was in the front seat. He also said that two or three black people were in the back seat. Mason told law enforcement that Gilbert told him the following:

4

[Gilbert] kept his hand on his gun the whole time because . . .

. . . .

. . . . [t]hey rob, you know. So he handed it to him. They put it on the scale, and then somebody in the back seat said, f[]k it, let's just go, let's go. And then the tires squealed. . . . [A]s soon as the tires squealed and he felt the truck going off, he came out. And probably about five -- probably about from here to there, he said he shot, like, four or five times and said he didn't know if he hit anyone.

Mason also affirmed that Gilbert never told him that anybody pulled a weapon on him, threatened him, hit him with a vehicle, or tried to run over him.

Around midnight, they learned through social media that Gilbert had killed someone. They then took Gilbert's Glock 9mm pistol into the woods and buried it, and Gilbert threw the live bullets into the trash pile. They also went two or three times to the site of the shooting to try to find the spent bullet casings, but could not find them. They then hid the Glock pistol's box in a drawer in a shed. Mason testified that Gilbert was very upset about the incident and that he stayed up with him until about 1:00 a.m. because he was worried about him. When law enforcement came the following day with a search warrant, Mason led them to the buried Glock pistol and its box. The officers also told him that they had located the spent casings.

After being confronted with a recording of a jail telephone call, Mason admitted that Gilbert had asked him not to testify. He also acknowledged that, when the SWAT team came to arrest Gilbert, Mason's father told Mason not to talk with the officers.

### C. Law Enforcement Testimony

Sheriff Tatum testified that the young men had told law enforcement that they were driving down the road and drove past a person who shot through the back of the truck, striking one of them. He did not believe that account. Tatum testified that he struck up a conversation with Larry

5

and asked him if he could show Tatum where the shooting had taken place. As they talked, Larry told him a different story. Larry also showed him where the shooting took place, and Tatum directed his investigators to the location. Tatum also testified about the details of Larry's statement and that the statement was consistent with the physical evidence found in the truck and at the scene.

Kenneth Dean, the jail administrator for the Hopkins County Sheriff's Department (HCSD), testified that Gilbert had no injuries when he was booked into jail the day after the shooting. Dean also identified the persons speaking on five recordings of telephone calls between Gilbert, his father, his mother, and Mason. On the recording from December 23, Gilbert said that one of his friends had told him that the charges against him would be dropped. The recording from January 20, 2018, showed that Gilbert learned for the first time that law enforcement had executed a search warrant on the property. Gilbert asked his mother repeatedly where they had looked and what had been found in the search. When his mother told him that law enforcement had talked to Mason, he quizzed her about where they talked to Mason and what he told them. When his father came to the phone and informed him that law enforcement found a 9mm pistol in the safe, Gilbert responded that he was not worried. On the recording from February 27, 2018, Gilbert urged Mason not to testify at his trial, no matter what the State offered him.

John Vance, a Texas Ranger with the Texas Department of Public Safety (DPS), was the lead investigator. He testified that four spent shell casings were found on the scene and that their locations showed that the shooter fired twice, retreated, and fired two more times.[4] The locations of the spent shell casings revealed that the bullets were fired when the truck was crossing the road

---

[4]Photographs taken during the investigation show the locations of the spent shell casings in relation to the acceleration marks left in the grass and on the road by the truck's rear tires as it crossed the road.

and travelling toward a mailbox on the other side of the road. Vance gave extensive testimony about his inspection of Larry's truck. The inspection showed that four bullets penetrated the truck and showed the trajectory of the bullets. One of the bullets was recovered from Phelps' left leg and another from his chest. Vance also testified that the physical evidence of the bullet trajectories showed that the shooter was directly behind the truck. Vance also explained that, after Mason led him to the back of the property near a trash pile, they recovered the Glock 9mm pistol from beneath an old recliner chair.

On cross-examination, Vance testified that he had interviewed Larry, John, Jack, and Jim twice. After his initial interviews of the young men, he learned from Tatum that there was new information. After interviewing the young men a second time, he characterized their first statements as lies.

Shea Shaw, a sergeant with the HCSD, was also involved in the investigation. On cross-examination, Shaw testified that, if someone was standing by a truck in a muddy location and the truck accelerated rapidly, it could place the person in danger. He also testified that it was possible that the truck could skid out and knock the person down.

Dennis Findley, a criminal investigator for the HCSD, testified that, during the execution of the search warrant on December 18, he recovered a Ruger 9mm pistol and 9mm ammunition from a gun safe in the main house on the property. He also testified that a Glock 9mm pistol was found on the property.

Corley Weatherford, chief investigator for the HCSD, took a statement from Mason. He testified that Mason told him that he and Gilbert knew that law enforcement would come, so they hid the gun and removed the live bullets from the gun, which they threw in the trash pile. Mason

7

also said that they looked for the spent casings at the scene of the shooting so they could remove them. In addition, Mason told him that the young men took Gilbert's last bag of marihuana and that that was probably why Gilbert was so angry.

Nathan Tunnell is a firearms and tool marks examiner for the DPS Crime Laboratory in Tyler. He testified that the four recovered shell casings and the bullets recovered from Phelps' thigh and chest were all fired from the Glock 9mm pistol recovered from the Gilbert property.

Dr. Chester Gwin is a medical examiner for the Dallas County Medical Examiner's Office. He testified that Phelps had two gunshot wounds to his body. One bullet entered his left upper back, hit the aorta and the right side of his heart, and lodged in soft tissue, where it was recovered. Gwin testified that Phelps would only have had seconds to minutes to live from such a wound. The second bullet entered the front of Phelps' left thigh, where it was recovered.[5]

### D. Gilbert's Testimony

Testifying in his own defense, Gilbert said that he had turned seventeen years old about six weeks before the incident. He had lived with his grandmother, Kathy Temples, since he was four or five years old. Two days before the incident, he sold Larry fourteen grams of marihuana for $90.00. Two hours later, Larry texted him and said that he thought it was short. In response, Gilbert offered to sell him some better stuff.

On December 17, Larry texted and asked if he had any marihuana. Gilbert offered to sell him a half of an ounce,[6] but no price was discussed. After Gilbert refused to come to town, Larry said he would come to his house. When Larry arrived, he texted Gilbert, who walked down to

---

[5]Gwin testified that this bullet could have come from behind Phelps if his leg had been propped up on the car seat.

[6]One-half ounce is the equivalent of fourteen grams.

meet them. Gilbert said he brought his gun with him because "the whole thing just seemed a little weird," and no price had been requested. When he got to the truck, it was running, but no lights were on. Gilbert went to the driver's window, and Larry asked if he could weigh the marihuana. He gave the marihuana to Larry and leaned against the door. Gilbert saw Larry and a front seat passenger, but he could not see how many people were in the back seat.

Larry said the marihuana only weighed "nine something." Gilbert asked if Larry would give him $100.00, to which Larry responded, "[Y]es." Then someone in the truck said, "[J]ust take it." Larry punched the accelerator and took off. When the truck took off, it pushed Gilbert back a couple of steps. Gilbert said he was scared and just reacted and fired without aiming at anything. He claimed he did not know if he hit anything or how many times he fired his pistol. Gilbert testified that he heard the tires squeal, that it startled him a little, and that he felt he was in danger. He said he knew that Larry had guns in his truck, but he never saw one and nobody pointed one at him.

Once the truck got down the road, Gilbert ran to his house and met up with Mason. Gilbert told Mason that he had been robbed. They talked for a short while, then Gilbert went to his room. About two hours later, he saw posts on social media that someone had shot at Larry's truck and that there was a death. Accordingly, Gilbert knew it was about the incident, so he threw the gun in the woods and told Mason he needed to talk to him. They buried the gun by the trash pile and threw out the remaining ammunition. A few hours later, law enforcement arrived and arrested Gilbert.

Gilbert said that he did not intend to shoot anybody and that he was not aiming at anything. Rather, he claimed he was just shooting out of reaction because he was scared. He did not know

9

Phelps, but had seen him around. Until he saw the Facebook post, Gilbert did not realize he had hit anything. He said he was backing up as he was firing and only fired four shots. He was sorry for what happened.

On cross-examination, Gilbert admitted that he had lied to Vance when he denied that he met up with Larry and sold him marihuana. He admitted that the bag of marihuana taken by Larry was his last bag, but denied that it upset him. He acknowledged that he did not find out that law enforcement had searched his house until one month after he was arrested. Gilbert also admitted that, when he told his mother and father that there were no new charges, he believed that his gun had not been found and thought his plan had worked. He further admitted that he got upset when he found out Mason had talked with law enforcement. Gilbert then admitted that, when his father told him that only the Ruger 9mm pistol out of the safe had been found, he was not worried because he thought law enforcement had not found the gun he used to kill Phelps.

Gilbert acknowledged that he later discovered Mason had cooperated with law enforcement from his lawyer and that he was furious with Mason at the time. About a month later, he spoke with Mason and told him not to get on the stand no matter what they offered him. Gilbert admitted that, at the time, he thought he would not get convicted.

Gilbert testified that he had the pistol in his possession for about thirty days. He admitted getting it out of the drawer that evening and loading it. He identified the Glock 9mm pistol as the gun he used to kill Phelps. While admitting that he hit the truck with all the bullets he fired, he maintained that it was an accident. He acknowledged that, looking back at it now, he did not have good cause to fire at the truck. He admitted that he fired the bullets and that he caused the death

10

of Phelps by shooting him with a firearm. He also admitted that he knowingly discharged the gun in the direction of the truck.

Gilbert also called his grandmother, Kathy Temples, as a witness. Temples testified that Gilbert had lived with her since he was three years old. She did not think he had a violent nature.

## II. Legally Sufficient Evidence Supports Gilbert's Conviction

In his first and second issues, Gilbert complains that there is legally insufficient evidence to support (1) the jury's verdict that he committed murder and (2) the jury's implicit rejection of his claim of self-defense. We disagree.

### A. Standard of Review

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In drawing reasonable inferences, the jury "may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life." *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet.

struck) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring)).  The jury is also the sole judge of the credibility of the witnesses and the weight to be given their testimony and may "believe all of a witness['] testimony, portions of it, or none of it."  *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014).  We give "almost complete deference to a jury's decision when that decision is based on an evaluation of credibility."  *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

In our review, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act."  *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)).  It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction."  *Id.*  Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone.  *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).  And we consider all the evidence admitted at trial, even improperly admitted evidence.  *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

**B.**   **Sufficient Evidence Supports the Murder Conviction**

Under the Texas Penal Code, a person commits first-degree murder if he:

> (1)     intentionally or knowingly causes the death of an individual;

> (2)     intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

12

> > (3)     commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, . . . he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b).

These three methods of committing murder are not separate offenses, but alternative methods of committing the same offense. *Smith v. State*, 436 S.W.3d 353, 378 (Tex. App.—Houston [14th Dist] 2014, pet. ref'd); *Lozano v. State*, 359 S.W.3d 790, 821 (Tex. App.—Fort Worth 2012, pet. ref'd); *see Aguirre v. State*, 732 S.W.2d 320, 325–26 (Tex. Crim. App. [Panel Op.] 1982) (op. on reh'g) (holding that an indictment alleging theories of both intentional and knowing murder and felony murder did not allege different offenses, but only different ways of committing the same offense); *accord Barfield v. State*, 202 S.W.3d 912, 916 (Tex. App.—Texarkana 2006, pet. ref'd). The State's indictment alleged four alternate theories of how Gilbert murdered Phelps corresponding to the statutory manner and means of committing first-degree murder.[7] The trial court charged the jury in the disjunctive, tracking the indictment, and the jury

_____

[7]The indictment alleged that, on or about December 17, 2017, Gilbert:

> Paragraph 1:     Did then and there intentionally or knowingly cause the death of an individual, namely, [Phelps], by shooting him with a firearm; or

> Paragraph 2:     Did then and there, with intent to cause serious bodily injury to an individual, namely, [Phelps], commit an act clearly dangerous to human life that caused the death of [Phelps], by shooting him with a firearm; or

> Paragraph 3:     Did then and there commit or attempt to commit a felony, to wit: Deadly Conduct, by knowingly discharging a firearm at or in the direction of one or more individuals, and in the course of or in furtherance of the commission or attempt to commit Deadly Conduct, the defendant committed or attempted to commit an act clearly dangerous to human life that caused the death of [Phelps], by discharging a firearm at or in the direction of one or more individual; or

> Paragraph 4:     Did then and there commit or attempt to commit a felony, to wit: Deadly Conduct, by knowingly discharging a firearm at or in the direction of a vehicle, and the defendant was reckless about whether the vehicle was occupied, and in the course of or in furtherance of the commission or attempt to commit Deadly Conduct, the defendant committed or attempted to commit

returned a general verdict.[8]  When a general verdict is returned and there is sufficient evidence to support a finding under any of the alleged theories submitted, we will uphold the verdict.  *Fuller v. State*, 827 S.W.2d 919, 931 (Tex. Crim. App. 1992) (en banc); *Aguirre*, 732 S.W.2d at 326.  We therefore need only determine whether there is sufficient evidence to support a guilty finding under one of the theories submitted to the jury.

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge.  *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."  *Id*.

To obtain a guilty verdict under Section 19.02(b)(2), the State had to prove beyond a reasonable doubt that Gilbert (1) intended (2) to cause serious bodily injury and (3)(a) committed an act clearly dangerous to human life (b) that caused the death of Phelps.  *See* TEX. PENAL CODE ANN. § 19.02(b)(2).  Gilbert only challenges the sufficiency of the evidence showing he committed

_____

an act clearly dangerous to human life that caused the death of [Phelps], by discharging a firearm at or in the direction of an occupied vehicle.

[8]As explained in *Kitchens v. State*,

[A]lthough the indictment may allege the differing methods of committing the offense in the conjunctive, it is proper for the jury to be charged in the disjunctive.  It is appropriate where the alternate theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted.

*Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (citations omitted).

14

an act clearly dangerous to human life.[9] This element requires a showing "that the act intended to cause serious bodily injury be objectively *clearly dangerous to human life.*" *Lugo-Lugo*, 650 S.W.2d 72, 81 (Tex. Crim. App. 1983) (en banc).

The evidence here shows that Gilbert shot several times into a truck that he knew was occupied by at least three people. As the Texas Court of Criminal Appeals has stated, "[F]iring a gun in the direction of an individual is an act clearly dangerous to human life." *Forest v. State*, 989 S.W.2d 365, 368 (Tex. Crim. App. 1999); *see Warren v. State*, No. 02-17-00221-CR, 2018 WL 3764069, at *4 (Tex. App.—Fort Worth Aug. 9, 2018, pet. ref'd) (mem. op., not designated for publication)[10] (shooting two shots into vehicle in road rage incident sufficient evidence under Section 19.02(b)(2)). Likewise, a rational jury could find that shooting several times into the cab of a truck that the defendant knows is occupied by multiple people is clearly dangerous to human life.

Even so, Gilbert argues that he cannot be found guilty under Section 19.02(b)(2) when he is acting out of self-defense. Yet, none of the cases cited by Gilbert support this proposition. And

---

[9]Although Gilbert does not challenge the sufficiency of the evidence supporting the jury's findings that he intended to cause serious bodily injury and that his actions caused the death of Phelps, we find that sufficient evidence supports those findings. Although Gilbert maintained that he fired out of a reaction and without aiming, the physical evidence and Gilbert's testimony showed that he backed up and fired two shots, then backed up again and fired two more shots into a truck that he knew was occupied by three or more people. The evidence also showed that each of the bullets Gilbert shot penetrated the truck and that at least three of the bullets penetrated the cab of the truck. By his own admission, one of the shots he fired caused the death of Phelps. That admission was confirmed by the physical evidence and the testimony of the medical examiner. Gilbert also testified that he purposefully took his loaded pistol to the transaction, "just in case," and that he attempted to hide the gun, its live ammunition, and the spent casings to impede the investigation by law enforcement. This evidence is sufficient to support the jury's findings that Gilbert intended to cause serious bodily injury to at least one of the occupants of the truck and that his shooting into the occupied truck caused the death of Phelps.

[10]"Although unpublished cases have no precedential value, we may take guidance from them 'as an aid in developing reasoning that may be employed.'" *Rhymes v. State*, 536 S.W.3d 85, 99 n.9 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd)).

by entering a verdict of guilty, the jury impliedly rejected his assertion that he was acting in self-defense. *See Braughton v. State*, No. PD-0907-17, 2018 WL 6626621, at \*12 (Tex. Crim. App. Dec. 19, 2018) ("A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory.") (quoting *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)).

After viewing all the evidence in the light most favorable to the jury's verdict, we find that legally sufficient evidence supports Gilbert's conviction for murder.

## C.    Sufficient Evidence Supports the Rejection of Gilbert's Self-Defense Theory

In his second issue, Gilbert challenges the legal sufficiency of the evidence supporting the jury's implicit finding rejecting his self-defense theory. Gilbert argues that ample evidence showed that he reasonably believed that deadly force was necessary to protect himself from the truck occupants' use or attempted use of deadly force and their commission of aggravated robbery. He also argues that the State failed to meet its burden of persuasion to disprove self-defense. Thus, he argues, no rational jury would have found against his self-defense theory beyond a reasonable doubt. Again, we disagree.

### 1.    Standard of Review

In evaluating a claim of insufficient evidence in the context of a self-defense issue, we apply the general sufficiency review principles set forth above, along with sufficiency review principles specific to self-defense. *Id.* When there is a claim of self-defense or defense of a third person to justify use of force or deadly force against another, "the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues." *Id.* (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton*, 804 S.W.2d at 913–14). The defendant must produce "some evidence that would

16

support a rational finding in his favor on the defensive issue." *Id.* (citing *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013)). The State need not produce evidence. Instead, its burden of persuasion only requires "that the State prove its case beyond a reasonable doubt." *Id.* (quoting *Zuliani*, 97 S.W.3d at 594 (citing *Saxton*, 804 S.W.2d at 913)). For that reason,

> [i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Id.* (quoting *Saxton*, 804 S.W.2d at 914). And as with the general sufficiency principles, the trier of fact is the sole judge of the credibility of defensive evidence, and it is free to accept it or reject it. *Id.* (citing *Saxton*, 804 S.W.2d at 914). As a result, "[d]efensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient." *Id.* (citing *Saxton*, 804 S.W.2d at 914).

### 2. The Law of Self-Defense

The use of deadly force is a defense to prosecution for murder if the use of deadly force is justified. *See* TEX. PENAL CODE ANN. §§ 9.02, 9.31–.32 (West 2011); *Braughton*, 2018 WL 6626621, at *9. "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a). And "[a] person is justified in using deadly force against another . . . when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the

17

other's use or attempted use of unlawful deadly force . . . ."[11] TEX. PENAL CODE ANN. § 9.32(a)(2)(A). "Reasonable belief" is defined as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42) (West Supp. 2018).

In some cases, the actor's belief that deadly force was immediately necessary is presumed to be reasonable. One of those circumstances is when (1) the actor "knew or had reason to believe that the person against whom the deadly force was used" was committing or attempting to commit certain enumerated offenses, (2) the actor did not provoke the other person, and (3) the actor was not engaged in criminal activity, other than a class C misdemeanor or a traffic violation. TEX. PENAL CODE ANN. § 9.32(b)(1). Here, it is undisputed that Gilbert was attempting to deliver marihuana, which is, at minimum, a class B misdemeanor.[12] Therefore, the presumption that Gilbert's belief was reasonable does not apply.

In addition, an actor is not required to retreat before using deadly force if he "has a right to be present at the location where the deadly force is used, [he] has not provoked the person against whom deadly force is used, and [he] is not engaged in criminal activity at the time deadly force is used . . . ." TEX. PENAL CODE ANN. § 9.32(c).

---

[11]A person may also use deadly force "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to prevent the other's imminent commission of" certain enumerated offenses, including "robbery or aggravated robbery." TEX. PENAL CODE ANN. § 9.32(a)(2)(B). That said, the jury was not instructed regarding this aspect of self-defense, and Gilbert does not complain that this omission was charge error.

[12]*See* TEX. HEALTH & SAFETY CODE ANN. § 481.120(b)(1) (West 2017).

### 3. Analysis

We have already determined that legally sufficient evidence supports the jury's finding, beyond a reasonable doubt, that Gilbert committed murder. So we must now "determine whether[,] after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact. . . . also would have found against [Gilbert] on the self-defense issue beyond a reasonable doubt." *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

Gilbert testified that it startled him when Larry took off rapidly in the truck, that it pushed him back a few feet, and that he felt he was in danger. Other witnesses differed on whether the truck's back end may have veered a bit toward Gilbert, and several witnesses acknowledged that it was possible that the truck's action could have injured Gilbert. The physical evidence, however, showed an arcing path out of the grass that headed away from anyone who may have been standing at the driver's window. It also showed that the truck continued in a direction away from where Gilbert was first standing, with no indication that the truck ever turned in Gilbert's direction. The physical evidence and Gilbert's testimony also showed that he stepped back a few feet before shooting two shots, retreated again, and shot two more times, all while the truck was going in the opposite direction. Gilbert did not testify that he thought his use of deadly force was necessary to prevent Larry's use or attempted use of deadly force against him. Rather, Gilbert stated that he did not think the truck would return. On this evidence, a rational jury could reasonably find that an ordinary and prudent person in the same circumstance would not believe that deadly force was necessary to prevent the use of deadly force by Larry.

Gilbert also took steps to cover up his involvement in the shooting. First, he hid the gun and the unused ammunition and attempted to hide the spent shells. In addition, when initially

19

interviewed by Vance, Gilbert denied having any involvement in the incident. A jury may consider a defendant's actions after the commission of the offense. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007). And during the time that he thought law enforcement had not recovered the murder weapon, Gilbert confidently expressed that he was not worried and that he believed the charges would be dropped. A rational jury considering Gilbert's attempted cover up, his confidence while he thought the cover up successful, and his denial of any involvement could draw a strong inference that the shooting was intentional, and not the result of self-defense. *See id.*

After considering all of the evidence in a light most favorable to the prosecution, we find that a rational jury could reasonably find, beyond a reasonable doubt, against Gilbert's claim of self-defense. As a result, we find that legally sufficient evidence supports the jury's rejection of Gilbert's self-defense issue. We overrule Gilbert's second issue.

## III. No Jury Charge Error

In his sixth, seventh, and eighth issues, Gilbert complains that the trial court erred by (1) submitting a jury instruction on retreat, (2) failing to submit an instruction regarding the effect of self-defense on the lesser-included offense of manslaughter, and (3) failing to submit different manner and means of murder as separate charges.

### A. Standard of Review and the Law Applicable to the Case

A two-step process is employed in our review of alleged jury charge error. *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal."

20

*Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32).

"[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007). "A trial court must submit a charge setting forth the 'law applicable to the case.'" *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007)). "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application. It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion." *Id*. (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)).

The level of harm necessary to require reversal due to jury charge error depends on whether the appellant properly objected to the error. *Abdnor*, 871 S.W.2d at 732. Because Gilbert did not object to the charge, we will not reverse unless the record shows the error led to egregious harm, *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)), so that he did not receive a fair and impartial trial. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *Loun v. State*, 273 S.W.3d 406, 416 (Tex. App.—Texarkana 2008, no pet.). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007). We review "the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information in the record as a whole" to make our determination. *Villarreal v. State*, 205 S.W.3d 103, 106 (Tex. App.—Texarkana 2006, pet. dism'd, untimely filed) (citing

*Almanza*, 686 S.W.2d at 171).  Direct evidence of harm is not required to establish egregious harm.

*Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

A trial court has the duty to provide the jury with "a written charge distinctly setting forth the law applicable to the case."  TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007); *Mendez v. State*, 545 S.W.3d 548, 551–52 (Tex. Crim. App. 2018).  Because "[a]n unrequested defensive issue is not the law applicable to the case," the trial court has no duty to instruct the jury on the issue.  *Taylor v. State*, 332 S.W.3d 483, 487 (Tex. Crim. App. 2011) (citing *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998)).  Yet, if the trial court instructs the jury sua sponte on a defensive issue, "that issue becomes 'law applicable to the case,' whether the defendant requested it or objected to its absence or not."  *Mendez*, 545 S.W.3d at 552–53 (citing *Barrera v. State*, 982 S.W.2d 415, 416 (Tex. Crim. App. 1988)).  In such an instance, the trial court must give the charge correctly, and any error in the charge given is "subject to review under *Almanza*."  *Id*. at 553 (quoting *Vega v. State*, 394 S.W.3d 514, 516 (Tex. Crim. App. 2013)).

**B.**    **The Trial Court Did Not Err By Giving an Instruction on Failure to Retreat**

In its charge on self-defense, the trial court gave the following instruction, apparently sua sponte,[13] pursuant to Section 9.32, subsections (c) and (d), of the Texas Penal Code:[14]

---

[13]The record is unclear on whether one of the parties requested this instruction, or the trial court included it on its own. Gilbert contends, and the State does not dispute, that the instruction was given by the trial court sua sponte.

[14]Section 9.32, subsections (c) and (d), provide:

> (c)    A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force as described by this section.

**Failure to Retreat**

A person who has a right to be present at a location where the person uses deadly force against another is not required to retreat before using deadly force in self-defense if both—

1.      the person with the right to be present did not provoke the person against whom the deadly force is used; and

2.      the person is not engaged in criminal activity at the time the deadly force is used.

Therefore, in deciding whether the state has proved that the defendant did not reasonably believe his use of deadly force was necessary, you must not consider any failure of the defendant to retreat that might be shown by the evidence if you find both—

1.      the defendant did not provoke [Phelps], the person against whom the defendant used deadly force; and

2.      the defendant was not engaged in criminal activity at the time he used the deadly force.

If you do not find both 1 and 2, you may consider any failure of the defendant to retreat that might be shown by the evidence in deciding whether the defendant reasonably believed his use of deadly force was necessary.[15]

Gilbert contends that the trial court erred in giving this instruction because it was undisputed at trial that Gilbert was engaged in criminal activity when he used deadly force. For that reason, he argues, Section 9.32 was not law applicable to the case, so the instruction was erroneous and was likely to confuse the jury so that it would conclude that he had a duty to retreat.

---

(d)      For purposes of Subsection (a)(2), in determining whether an actor described by Subsection (c) reasonably believed that the use of deadly force was necessary, a finder of fact may not consider whether the actor failed to retreat.

TEX. PENAL CODE ANN. § 9.32(c), (d) (West 2011).

[15]We note that this instruction follows the pattern jury charge on failure to retreat. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Criminal* CPJC 31.8 (2018).

Gilbert does not contend that the trial court's instruction was an incorrect statement of the law as set forth in Section 9.32, subsections (c) and (d). As noted by the authors of the Texas Criminal Pattern Jury Charges, "One reasonable reading of [Section 9.32, subsections (c) and (d),] is that if a trier of fact finds the defendant was required to retreat and did not do so, this is to be considered as bearing on whether the defendant reasonably believed the force the defendant used was necessary as required by the general rule of self-defense." Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Criminal* CPJC 31.5 (2018). Indeed, the Texas Court of Criminal Appeals has affirmatively stated that, "[w]hen [Section 9.32, subsections (c) and (d),] do not apply, the failure to retreat may be considered in determining whether a defendant reasonably believed that his conduct was immediately necessary to defend himself or a third person." *Morales v. State*, 357 S.W.3d 1, 5 (Tex. Crim. App. 2011). On the other hand, the court indicated that a jury instruction on a general duty to retreat would be erroneous since it is not authorized by statute and would be a comment on the weight of the evidence. *Id.*

Here, the trial court's charge does not contain an instruction indicating that Gilbert had a duty to retreat. Rather, the trial court's instruction correctly instructed the jury under Section 9.32(c) about when a defendant is not required to retreat. It also correctly instructed the jury under Section 9.32(d) that, if it found that Gilbert met the conditions of subsection (c), then it must not consider evidence of Gilbert's failure to retreat. In accordance with *Morales*, and these sections, the trial court then instructed the jury that, if it found that Gilbert did not meet the conditions of subsection (c), then it may consider any evidence of Gilbert's failure to retreat when determining whether he reasonably believed that his use of deadly force was necessary. Gilbert admits that he

24

did not meet the conditions of Section 9.32(c). Thus, this final instruction was a correct statement of "the law applicable to the case." To place this instruction in the proper context, it was also necessary to instruct the jury regarding Section 9.32, subsections (c) and (d).

We therefore find that the trial court did not err in giving the instruction on the failure to retreat. For that reason, we overrule Gilbert's sixth issue.

### C. Gilbert's Complaint Regarding the Manslaughter Instruction is Moot

In his seventh point of error, Gilbert complains that the trial court erred in failing to distinctly apply the law of self-defense to the lesser-included offense of manslaughter and in failing to explain how Section 9.05 of the Texas Penal Code[16] might apply to manslaughter. Since we previously found that there is sufficient evidence supporting Gilbert's conviction for murder, this issue is moot. We overrule Gilbert's seventh issue.

### D. The Trial Court Did Not Err in its Instructions on Murder

In his eighth issue, Gilbert asserts that the trial court erred by submitting the State's alternative theories of murder as alternative means of committing a single offense. Although Gilbert acknowledges that the State's theories of how the murder of Phelps was committed correspond to the three methods of first-degree murder contained in Section 19.02(b), he argues

---

[16]Section 9.05 provides:

> Even though an actor is justified under this chapter in threatening or using force or deadly force against another, if in doing so he also recklessly injures or kills an innocent third person, the justification afforded by this chapter is unavailable in a prosecution for the reckless injury or killing of the innocent third person.

TEX. PENAL CODE ANN. § 9.05 (West 2011).

that each of the three methods contain a different *mens rea* and are, therefore, three different offenses, which requires jury unanimity on one of the methods.[17]

In addressing the requirement of jury unanimity in relation to an offense that may have multiple ways of being committed, the Texas Court of Criminal Appeals has stated:

> Under the Texas Constitution and Code of Criminal Procedure, a Texas jury must reach a unanimous verdict. The jury must agree that the defendant committed one specific crime. That does not mean, however, that the jury must unanimously find that the defendant committed that crime in one specific way or even with one specific act. The Legislature has considerable discretion in defining crimes and the manner in which those crimes can be committed. That discretion is limited only by the Due Process Clause of the federal constitution and the Due Course of Law provision of the Texas Constitution.
>
> In deciding what elements and facts a jury must unanimously agree on, courts implement the legislative intent behind the penal provision. Both Texas and federal courts have held that the jury must be unanimous in finding that the defendant committed a specific statutory crime. But it is the legislature, not the courts, that defines the forbidden act, the required culpability, and the particular result, if any.

*Landrian v. State*, 268 S.W.3d 532, 535–36 (Tex. Crim. App. 2008) (citations omitted) (footnotes omitted). Jury unanimity "means that each and every juror agrees that the defendant committed the same, single, specific criminal act." *Ngo*, 175 S.W.3d at 745.

As we have previously noted, the Legislature has provided that a person commits first degree murder if he:

      (1)     intentionally or knowingly causes the death of an individual;

      (2)     intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

---

[17]In support of his argument, Gilbert cites to general statements of law contained in several cases involving lesser-included offenses. While those statements may apply when analyzing a jury charge concerning lesser-included offenses, they are generally inapplicable in this case.

26

> (3)     commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, . . . he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b).

Although the conduct may be very different, these three methods of committing murder are not separate offenses, but rather alternative methods of committing the same offense. *Smith*, 436 S.W.3d at 378; *Lozano*, 359 S.W.3d at 821; *see Aguirre*, 732 S.W.2d at 325–26 (holding that an indictment alleging theories of both intentional and knowing murder and felony murder did not allege different offenses, but only different ways of committing the same offense); *accord Barfield*, 202 S.W.3d at 916. The State's indictment alleged four alternate theories of how Gilbert murdered Phelps, corresponding to the statutory manner and means of committing first-degree murder.

The trial court charged the jury in the disjunctive, tracking the indictment, and the jury returned a general verdict. In a case involving capital murder, the Texas Court of Criminal Appeals held that,

> although the indictment may allege the differing methods of committing the offense in the conjunctive, it is proper for the jury to be charged in the disjunctive. It is appropriate where the alternate theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted.

*Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (citations omitted). In *Aguirre*, the court found that it was proper to charge the jury in the disjunctive in a murder case in which the state alleged alternative theories of intentional and knowing murder and felony murder, "[b]ecause appellant's indictment did not allege different offenses but only alleged different ways of committing the same offense." *Aguirre*, 732 S.W.2d at 326. Thus, in homicide cases, "different

27

legal theories involving the same victim are simply alternate methods of committing the same offense." *Huffman v. State*, 267 S.W.3d 902, 905 (Tex. Crim. App. 2008). In such a case, the jury need not agree unanimously as to the manner and means by which the offense was committed. *See Aguirre*, 732 S.W.2d at 326.

That said, Gilbert argues that the jury had to be unanimous regarding his mental state as he aimed and fired the murder weapon, citing *Ngo*, 175 S.W.3d at 744. In *Ngo*, the victim's credit cards were stolen when her house was burglarized. A few weeks later, Ngo attempted to use the credit cards to purchase beer at a bar. *Id.* at 741. At trial, the jury was charged disjunctively, which allowed the jury to convict Ngo of credit card fraud by any one of three different acts,[18] but the jurors were not required to be unanimous in their verdict as to any one act. *Id.* at 744–45. Since the indictment alleged three different acts that occurred at three different times, the Texas Court of Criminal Appeals held that the jury was required to be unanimous as to the same, single, specific criminal act. *Id.* at 745.

*Ngo* is distinguishable from this case. Here, there was one act—firing four shots toward an occupied vehicle—that occurred at one time and caused the death of Phelps. Thus, there was only one criminal act. But the mental state of Gilbert in firing into the vehicle could be described in a number of ways: (1) he could have intended to cause the death of Phelps (or another occupant of the vehicle); (2) he could have been aware that firing the shots into the vehicle was reasonably certain to cause the death of Phelps or another occupant; (3) he could have intended to cause one of the occupant's serious bodily injury and caused the death of Phelps; or (4) he could have

---

[18]That is, by stealing the credit card, by receiving the card knowing it was stolen, or by presenting a credit card with intent to obtain a benefit, knowing the use was without the effective consent of the owner. *Ngo*, 175 S.W.3d at 744.

28

committed deadly conduct and caused the death of Phelps. Under Section 19.02(b), each of these theories simply describe different ways of committing the same offense, or criminal act, since there was only one criminal act involving one victim. And in a case decided after *Ngo*, the Texas Court of Criminal Appeals reaffirmed, "With respect to homicide offenses—which focus on the death of an individual—'we have held that different legal theories involving the same victim are simply alternate methods of committing the same offense.'" *Davis v. State*, 313 S.W.3d 317, 342 (Tex. Crim. App. 2010) (quoting *Huffman*, 267 S.W.3d at 905). Thus, the jury charge may disjunctively allege alternative theories of murder found in Section 19.02, as long as there is only one victim, and the requirement of jury unanimity will be satisfied.

For that reason, we find that the trial court did not err by submitting the State's alternative theories of murder as alternative means of committing a single offense. We overrule Gilbert's eighth issue.

## IV. No Error in Admitting Evidence

In his third, fourth, and fifth issues, Gilbert asserts that the trial court erred in (1) admitting evidence that improperly bolstered the testimony of one of the State's witnesses, (2) admitting a photograph of the victim in the hospital, and (3) admitting a video recording of the victim's family during the punishment phase of the trial.

### A. Standard of Review

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might

29

disagree.'" *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case." *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

## B. Gilbert Waived his Bolstering Complaint

During Sheriff Tatum's testimony, the State sought to have Tatum testify as to the details of Larry's second statement regarding the incident, to which Gilbert objected as hearsay. After a short voir dire, the trial court sustained the objection. After cross-examination, a hearing was held at the bench in which the State argued that Gilbert had opened the door to Tatum testifying about Larry's statement by its cross-examination, and the trial court allowed the State to solicit the testimony. On appeal, Gilbert complains that the trial court erred because the admission of the statement was improper bolstering of Larry's and the other young men's subsequent testimony and that it deprived him of his right to confront and cross-examine witnesses against him.

"If a defendant objects to the admission of evidence but the same evidence is subsequently introduced from another source without objection, the defendant waives his earlier objection." *Bryant v. State*, 282 S.W.3d 156, 165 (Tex. App.—Texarkana 2009, pet. ref'd) (quoting *Massey v. State*, 933 S.W.2d 141, 149 (Tex. Crim. App. 1996)). After Tatum's testimony, Larry testified without objection that, after first telling Tatum a lie, he told him everything that happened, including the details about the shooting. Since "substantively equivalent testimony to which he

30

had earlier objected was later admitted without objection," Gilbert waived this issue for our review. *Id*. at 166 (citing *Massey*, 933 S.W.2d at 149). We overrule Gilbert's third issue.

### C.      Gilbert Waived his Complaints Regarding the Victim's Photograph

In his fourth issue, Gilbert complains of the admission of a photograph of Phelps' body laying on a gurney while he was at the hospital. The photograph, State's Exhibit 180, was offered with a group of photographs taken at the hospital and marked State's Exhibits 175 through 181. Gilbert objected to Exhibit 180, asserting that it was prejudicial, inflammatory, irrelevant, and cumulative. On appeal, Gilbert complains that the State only wanted to admit the photograph in order to inflame the jury and that it was irrelevant. But an autopsy photograph of Phelps, which is almost identical to Exhibit 180, was introduced earlier in the trial. The rule is the same, whether substantially the same evidence is received without objection before or after the complained-of ruling. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *see Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("To preserve error in admitting evidence, a party must make a proper objection and get a ruling on that objection. . . . An error in the admission of evidence is cured where the same evidence comes in elsewhere without objection."). Gilbert has therefore waived these complaints for our review. We overrule Gilbert's fourth issue.

### D.      No Error in Admitting Video Recording of the Family During Punishment

In his fifth issue, Gilbert complains of the admission, during the punishment phase, of a recording of Phelps' family at the hospital. The recording was offered as victim-impact evidence. Although Gilbert acknowledges that victim-impact evidence is admissible during the punishment phase, he argues that the recording has no bearing on his personal responsibility and moral culpability. *See Haley v. State*, 296 S.W.3d 549, 552 (Tex. Crim. App. 2009) ("Victim . . . impact

31

evidence . . . [is] admissible during the punishment phase if the fact[-]finder may rationally attribute the evidence to the accused's 'personal responsibility and moral culpability.'") (quoting *Salazar v. State*, 90 S.W.3d 330, 335 (Tex. Crim. App. 2002)).

Under Article 37.07 of the Texas Code of Criminal Procedure, any evidence that the trial court "deems relevant to sentencing" is admissible during the punishment phase of a trial. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West Supp. 2018); *Sims v. State*, 273 S.W.3d 291, 295 (Tex. Crim. App. 2008). If the evidence "will assist the fact[-]finder in deciding the appropriate sentence in a particular case," it is relevant to determining punishment. *Sims*, 273 S.W.3d at 295 (citing *Mendiola v. State*, 21 S.W.3d 282, 285 (Tex. Crim. App. 2000)).

That said, even if punishment-phase evidence is deemed relevant, it is subject to analysis under Rule 403.[19] *Rodriguez v. State*, 203 S.W.3d 837, 843 (Tex. Crim. App. 2006). When considering the admissibility of victim-impact evidence, the trial court must consider these factors: "(1) how probative is the evidence; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Salazar v. State*, 90 S.W.3d 330, 336 (Tex. Crim. App. 2002). The trial court is presumed to have engaged in this analysis. *Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997).

We review the trial court's analysis under an abuse-of-discretion standard and will only overturn its ruling if it falls outside the "zone of reasonable disagreement." *Rodriguez*, 203 S.W.3d at 843 (quoting *Robbins v. State*, 88 S.W.3d 256, 260 (Tex. Crim. App. 2002)). There is no bright-

---

[19]Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403.

line test for deciding what evidence is and is not admissible as victim-impact evidence. *Salazar*, 90 S.W.3d at 336.

The Texas Court of Criminal Appeals has recognized that victim-impact evidence is relevant when it "has some bearing on the defendant's personal responsibility and moral culpability." *Id.* at 335 (citing *Mosley v. State*, 983 S.W.2d 249, 261–62 (Tex. Crim. App. 1998)). The court explained this relevance:

> As the Supreme Court stated in *Payne v. Tennessee*, such evidence is "designed to show . . . *each* victim's 'uniqueness as an individual human being,'" and is a way to inform "the sentencing authority about the specific harm caused by the crime in question." [501 U.S. 808, 823, 825 (1991)]. Such evidence is of two distinct, but related, types: victim *character* evidence and victim *impact* evidence. The former is designed to give the jury "a quick glimpse of the life that the petitioner chose to extinguish, to remind the jury that the person whose life was taken was a unique human being." [*Id.* at 830–31]. The latter is designed to remind the jury that murder has foreseeable consequences to the community and the victim's survivors—family members and friends who also suffer harm from murderous conduct.
>
> . . . . But both defendants and juries must also know that the homicide victim is not a faceless, fungible stranger. *Id.* at 838. Every homicide victim is an individual, whose uniqueness the defendant did or should have considered, regardless of whether the murderer actually knew any specific details of the victim's life or characteristics. *See id.*

*Salazar*, 90 S.W.3d at 335 (footnote omitted) (citations omitted).

In this case, before admitting the video recording, the trial court reviewed it and noted that it was three minutes in length and showed the immediate impact on the family of learning of the victim's death. The recording confirms this analysis. The recording shows some of the family members crying and distraught and other members trying to comfort them, but nothing unusual that would impress the jury in an irrational or indelible way. In addition, the recording effectively

33

showed the consequences to the victim's survivors, without the need to have each family member testify.[20]  We find that all four factors favored admissibility of the recording.

As a result, we cannot say that the trial court's decision was outside the zone of reasonable disagreement.  *Rodriguez*, 203 S.W.3d at 843.  For that reason, we find that the trial court did not err in admitting the recording.  We overrule Gilbert's fifth point of error.

## V.    Conclusion

For the reasons stated, we affirm the trial court's judgment.


Scott E. Stevens
Justice


Date Submitted:      February 12, 2019
Date Decided:        April 3, 2019

Publish

---

[20]Only one family member and one family friend testified during the punishment phase, both without objection.