

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00487-CR

_____

KODY AUSTIN LOTT, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. 58029-A
and
On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. C009529

_____

Before Sudderth, C.J.; Gabriel and Womack, JJ.
Memorandum Opinion by Justice Gabriel

## MEMORANDUM OPINION

Rejecting his defense of insanity, a jury convicted appellant Kody Austin Lott of murder and of aggravated assault. For the murder, the jury assessed Lott's punishment at confinement for life and a $10,000 fine; the jury assessed punishment at twenty years' confinement and a $10,000 fine for the aggravated assault. The trial court sentenced Lott accordingly and ordered that the sentences run concurrently. On appeal, Lott challenges his convictions and sentences in four issues. Finding no merit in those issues, we affirm the trial court's judgments.

## I. BACKGROUND

Many students at Wichita Falls' McNeil Junior High School use a nearby alley to walk to and from school. When school let out on the afternoon of September 2, 2016, several students, including thirteen-year-old eighth-graders Lauren Landavazo and Makayla Smith, began walking home down that alley toward Trinidad Drive, as they had on many other occasions. When they neared the alley's intersection with Trinidad Drive, a white male with shaggy brown hair stopped his gold Chevy Tahoe in the northbound lane of Trinidad Drive, aimed a semi-automatic AR-15 style rifle into the alley, and opened fire on the children. The driver then sped away.

Several children who had been walking in the alley behind Lauren and Makayla heard the gunshots, saw Lauren fall and Makayla attempt to run, and scattered for cover. When the gunshots stopped, some of those children came back into the alley and discovered that Makayla had fallen to her hands and knees in the alley and was

bleeding. She had suffered a single gunshot to her chest, an injury she survived. But Lauren lay fatally wounded with fifteen gunshots to her head, torso, arms, and hands.

The shooter remained at large until a tip led police to pull over a gold Chevy Tahoe two days after the shooting. Twenty-year-old Lott was driving, and officers arrested him after they conducted a consensual search of the Tahoe and found brass knuckles, which at the time was a prohibited weapon.[1] While in custody for the prohibited weapon, Lott confessed to shooting Lauren and Makayla. He also confided to police that he had been monitoring media reports of the shooting and that he had been angry when those reports characterized the shooting as a "senseless act of violence." Lott insisted that the shooting was not random or senseless but was "a sophisticated [expletive] assassination" that he had carried out because he "just wanted some people to feel a little bit of pain."

## II. SUPPRESSION OF EVIDENCE

Lott filed a pretrial motion asking the trial court to suppress (1) any evidence seized as a result of the search of the Tahoe because the initial stop was not supported by reasonable suspicion and (2) evidence of his confession because he did not knowingly, intelligently, and voluntarily waive his privilege against self-incrimination.

---

[1]At the time Lott was arrested, Section 46.05 provided that intentionally or knowingly possessing knuckles was a Class A misdemeanor. *See* Act of May 11, 2015, 84th Leg., R.S., ch. 69, § 1, 2015 Tex. Sess. Law Serv. 1060, 1060–61 (amended 2017 & 2019). Effective September 1, 2019, the legislature amended Section 46.05 to remove knuckles as a prohibited weapon. *See* Tex. Penal Code Ann. § 46.05(a)(1).

3

*See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3, art. 38.23(a). The trial court heard the motion during trial outside the jury's presence and denied the motion. The trial court entered findings and conclusions regarding Lott's confession and concluded that it was voluntarily made and admissible.[2] *See id.* art. 38.22, § 6. As to Lott's challenge to the stop and subsequent search of the Tahoe, the trial court stated on the record that the officer had had reasonable suspicion to stop the Tahoe and that the resulting search of the Tahoe had been conducted with Lott's consent. In his first two issues, Lott argues that the denial of his motion to suppress was an abuse of discretion.

## A. STANDARDS OF REVIEW

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We defer almost totally to the trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

---

[2]The trial court charged the jury not to consider Lott's statement to Killingsworth unless the jury determined beyond a reasonable doubt that Lott voluntarily gave the statement.

In other words, we view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence when viewed in the light most favorable to the trial court's ruling, supports those findings. *Kelly*, 204 S.W.3d at 818–19; *see also State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006) (recognizing findings and conclusions may be "stated on the record at the hearing"). We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 818.

## B. TRAFFIC STOP

### 1. Suppression Hearing

Officer John Gordon of the Wichita Falls Police Department was the only witness at the suppression hearing regarding the traffic stop. The trial court also admitted Defendant's Exhibit 1, which contained a series of 911 calls related to the shooting investigation.

Gordon was a patrol officer whose duties included conducting traffic stops. On September 4, 2016, he was aware that the shooting had occurred two days earlier and that the investigation of that case had taken a high priority within the department. In fact, before Gordon started his shift that day, he had been told that investigators had developed a description of the suspect. The suspect was described as a white

5

male who had shoulder-length, possibly shaggy hair and who was driving a gold Chevy Tahoe.

In the early afternoon, a dispatch came over the computer in his patrol car to "check suspicious" at the Fountaingate Apartment complex, which is approximately one block away from the shooting site. The dispatcher's information was based on a 911 call from Joanne Perez. Perez had told the dispatcher that she had driven by the location where the shooting had happened and that she had stopped on a nearby road that went to the Fountaingate Apartments. Perez stated that she had seen a tall, white male, with shoulder-length hair and driving a gold Chevy Tahoe, park in front of one of the apartments. She further said that the driver had gotten out of the Tahoe, had retrieved something out of the back seat, which "looked like a rifle . . . wrapped in clothes and blankets," and that he had hurriedly and "suspicious[ly]" taken the bundle into one of the apartments.

Perez provided the dispatcher with the Tahoe's license-plate number and the apartment the driver had gone into. She also told the dispatcher that she was willing to stay at the scene and speak to officers about the call if needed. She gave the dispatcher her location and information about the car she was in. Perez then reported that the driver of the Tahoe had reappeared and was leaving the apartment complex. The dispatcher instructed Perez to remain where she was; Perez remained on the phone until the dispatcher informed her that officers had located the Tahoe.

6

The dispatcher told Gordon the basic information Perez had reported. Specifically, the dispatcher told Gordon that the "check suspicious" dispatch involved a report that a white male with shoulder-length hair had taken a rifle into one of the apartments, that he had done so in a hurry, and that he had then left in a gold Chevy Tahoe. The dispatcher also gave Gordon the license-plate number of the Tahoe and the direction the Tahoe was heading in. Gordon quickly found the Tahoe at a stop light.

Gordon followed the Tahoe and confirmed with the dispatcher that the license-plate number matched Perez's report. Gordon activated his patrol car's emergency lights and stopped the Tahoe, which was driven by Lott. Gordon testified that he did not have an independent reason for stopping Lott other than the information he had received from the dispatcher.

## 2. Applicable Law

In his first issue, Lott contends the trial court erred by denying his motion to suppress because Gordon did not have reasonable suspicion to initiate the traffic stop, which rendered the stop unlawful. It is lawful for a police officer to conduct a brief investigatory detention if the officer has reasonable suspicion of criminal activity. *See Matthews v. State*, 431 S.W.3d 596, 602 (Tex. Crim. App. 2014). Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead the officer to reasonably conclude that the

7

person detained is, has been, or soon will be engaged in criminal activity. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 36 (Tex. Crim. App. 2017).

Reasonable suspicion is an objective standard that disregards the actual subjective intent of the detaining officer and instead looks to whether there was an objectively justifiable basis for the detention. *Wade v. State*, 422 S.W.3d 661, 668 (Tex. Crim. App. 2013). We determine whether an investigatory detention was supported by reasonable suspicion by considering the totality of the circumstances. *Delafuente v. State*, 414 S.W.3d 173, 177 (Tex. Crim. App. 2013). As the name itself suggests, the totality-of-the-circumstances test does not look to individual circumstances in isolation. *See Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). Actions in a series may appear innocent when viewed in isolation but may nevertheless reasonably suggest recent or imminent criminal conduct when viewed in the context of the totality of the circumstances. *Arguellez v. State*, 409 S.W.3d 657, 663 (Tex. Crim. App. 2013).

Additionally, the detaining officer need not be personally aware of every fact that objectively supports reasonable suspicion. *Derichsweiler*, 348 S.W.3d at 914. We are to consider the cumulative information known to the cooperating officers at the time of the stop, and a police dispatcher is ordinarily regarded as a cooperating officer for that purpose. *Id.* Information provided to police by a citizen-informant who identifies herself and who may be held to account for the accuracy and veracity of her report may be regarded as reliable. *Id.*

8

### 3. Discussion

Lott argues that the individual facts the trial court heard at the suppression hearing did not establish reasonable suspicion for the stop. For example, Lott maintains that the dispatcher's description of a white male with shoulder-length hair was simply too generic to tie him to criminal activity. He argues that merely because someone carries a rifle into an apartment does not indicate that person is, has been, or will be involved in criminal conduct. He contends that the apartment identified in the "check suspicious" dispatch was not close enough to the shooting scene to raise reasonable suspicion. And he suggests that too much time had passed since the shooting to satisfy the reasonable-suspicion standard. But as noted above, a reasonable-suspicion analysis is not based on events in isolation but on the totality of the circumstances. *Arguellez*, 409 S.W.3d at 663.

At the suppression hearing, Gordon testified that before he received the dispatch, he had been briefed about the shooting and given a description of the shooter and his car. Gordon initiated the traffic stop based on the information from the "check suspicious" dispatch. That dispatch information was based on Perez's 911 call, which was admitted into evidence at the suppression hearing. During the 911 call, Perez identified herself to the dispatcher and was in a position to be accountable for the report she was making. The trial court was entitled to treat the information Perez conveyed to the dispatcher as reliable. *See Derichsweiler*, 348 S.W.3d at 914–15;

9

*Clary v. State*, No. 09-16-00377-CR, 2018 WL 651252, at \*3 (Tex. App.—Beaumont Jan. 31, 2018, no pet.) (mem. op., not designated for publication).

When determining whether reliable information that a known citizen-informant provides to police was sufficient to furnish police with reasonable suspicion, we look to whether that information, "viewed through the prism of the detaining officer's particular level of knowledge and experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot." *Deirchsweiler*, 348 S.W.3d at 914; *see Cook v. State*, 509 S.W.3d 591, 601–02 (Tex. App.—Fort Worth 2016, no pet.). Viewing the information Perez provided through the prism of Gordon's particular level of knowledge and experience, we conclude Gordon had reasonable suspicion to believe that the driver of the gold Chevy Tahoe Perez reported to the dispatcher, who turned out to be Lott, may have been involved in the shooting of Lauren and Makayla. We conclude that the evidence, viewed deferentially, supported the trial court's findings and that the trial court properly applied the law to those found facts. We overrule Lott's first issue.

## C. CONFESSION

After his arrest for possession of a prohibited weapon, Lott was eventually taken to an interview room at the Wichita Falls Police Department, where two police officers interviewed him over the course of nearly four hours. During the interview, which was videotaped, Lott confessed to shooting Lauren and Makayla. In his second issue, Lott contends that the trial court abused its discretion by denying his motion to

10

suppress his confession because he did not knowingly, intelligently, and voluntarily waive his rights. For the following reasons, we conclude that the trial court properly applied the law to the supported facts it found and we overrule issue two.

## 1. Suppression Hearing

On January 31, 2018, nearly eight months before trial and over fifteen months after the offense date, Lott's counsel filed a motion for a competency examination, asserting that he was unable to effectively communicate with Lott and that Lott appeared to lack a rational or factual understanding of the nature of the proceedings against him. Lott's counsel asked the trial court to appoint an expert to examine Lott and to provide a report as to Lott's competency to stand trial. The trial court granted the motion and appointed Dr. Stacey Shipley to examine Lott. On March 23, 2018, the trial court signed a judgment of incompetency in which it found, based on Shipley's report, that Lott was incompetent to stand trial because of mental illness and ordered him committed with the objective to attain competency to stand trial.

Shipley's report was not introduced at the suppression hearing, and neither party requested the trial court to take judicial notice of the report for purposes of that hearing. The trial court took judicial notice of Lott's pretrial motion for a competency examination, of the trial court's order on that motion, and of the trial court's subsequent judgment of incompetency. The trial court additionally admitted Court's Exhibit 2, which was a copy of the statutory warnings set forth in Article

11

38.22. Officer Allen Killingsworth was the only witness at the suppression hearing to testify regarding Lott's confession.

Killingsworth, a 26-year veteran of the police department, testified that on September 4, 2016, he interviewed Lott after Lott's arrest.[3] Killingsworth stated that as a detective in the crimes-against-persons unit, he had received training in how to conduct homicide investigations as well as in how to obtain statements from witnesses and suspects.

Before interviewing Lott, Killingsworth presented Lott with Court's Exhibit 2, which contained the following statutory warnings:

1. I have the right to remain silent and not make any statement at all and that any statement I make may be used against me at my trial;

2. Any statement I make may be used as evidence against me in court;

3. I have the right to have a lawyer present to advise me prior to and during any questioning;

4. If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning, and;

5. I have the right to terminate the interview at any time.

See Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(2). Lott wrote his initials next to each warning. The form contained a sentence stating that Lott's signature indicated

---

[3]Killingsworth testified that the interview was recorded by audio and video. Neither the audio recording nor the video recording were introduced at the suppression hearing.

12

that he had read and understood the enumerated warnings and that he was waiving his rights "voluntarily without duress, coercion, unlawful influence or inducement, or promise of reward, clemency[,] or immunity." Lott signed the form. Killingsworth also verbally apprised Lott of these rights. Along with signing the form, Lott verbally agreed to waive his rights and to submit to an interview.

Killingsworth testified that when he was reading the warnings to Lott, Lott could have asked him questions but did not do so. Lott never asked to terminate the interview. Killingsworth stated that he did not coerce or threaten Lott at any time and he opined that Lott voluntarily and intelligently waived his rights. Additionally, Killingsworth testified that based on his experience as a police officer, which included dealing with mentally ill people, Lott did not appear to be under any type of delusion during the interview.

Killingsworth indicated that Lott appeared to understand the questions he was being asked during the interview and that he responded intelligently to those questions. He said that if at any time Lott had appeared to be under any type of delusion or to be in need of immediate mental health assistance, he would have terminated his interview of Lott. Killingsworth further testified that he also would have terminated the interview if Lott had given any indication that he did not understand his rights. Killingsworth acknowledged that Lott made statements about the devil during the interview, recounted that he previously had been in a psychiatric

hospital, and was in drug withdrawal; but Killingsworth nevertheless maintained that Lott was not delusional during the interview.

In denying Lott's motion to suppress evidence of his confession, the trial court expressly found that

[1.] The accused was given the warnings required by Article 38.22, Section 2(a), of the Texas Code of Criminal Procedure prior to his statement. The accused knowingly, intelligently[,] and voluntarily waived his rights set out in the warnings.

[2.] The accused thereafter gave an oral statement to detectives of the Wichita Falls Police Department in the Crimes Against Persons Unit. Those detectives complied with the applicable provisions of Article 38.22, Section 3, of the Texas Code of Criminal Procedure.

[3.] The statement [occurred during] a custodial interrogation.

[4.] The statement was made under voluntary conditions, as a matter of law and fact.

## 2. Applicable Law

### a. Fifth Amendment privilege against self-incrimination

The Fifth Amendment, which is applicable to the states, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008). Under the privilege, statements obtained from an accused during a custodial interrogation are inadmissible unless the government demonstrates that it first observed certain procedural safeguards. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Pecina v. State*, 361 S.W.3d 68, 75 (Tex. Crim. App. 2012). Those procedural

14

safeguards include advising the accused of the warnings spelled out in *Miranda*. 384 U.S. at 444, 467–73; *see Pecina*, 361 S.W.3d at 75. And under *Miranda*, statements an accused makes during a custodial interrogation are inadmissible at trial unless the accused is advised of his rights and knowingly, intelligently, and voluntarily waives them. *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010); *Pecina*, 361 S.W.3d at 75.

### b. Statutory protection against self-incrimination

In addition to being governed by *Miranda*, an accused's privilege against self-incrimination during a custodial interrogation is protected under Article 38.22. Tex. Code Crim. Proc. Ann. art. 38.22; *see Joseph v. State*, 309 S.W.3d 20, 23–24 (Tex. Crim. App. 2010). Oral statements a defendant makes during a custodial interrogation are inadmissible at trial unless the defendant is first given the statutorily required warnings and thereafter knowingly, intelligently, and voluntarily waives those stated rights. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(2). These warnings are virtually identical to the *Miranda* warnings, with one exception—Article 38.22 includes an additional warning that the accused "has the right to terminate the interview at any time." Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a)(5); *see Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

### c. Waiver of rights

Here, there is no dispute that Lott's lengthy confession occurred during a custodial interrogation. Accordingly, to demonstrate the confession was not barred under *Miranda* or Article 38.22, the State bore the burden to show by a preponderance

15

of the evidence that Lott validly waived his rights. *See Joseph*, 309 S.W.3d at 24; *Herrera*, 241 S.W.3d at 526. The inquiry into whether a defendant's waiver was valid has two facets. *See Berghuis*, 560 U.S. at 382–83; *Joseph*, 309 S.W.3d at 25. First, the waiver must have been "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis*, 560 U.S. at 382; *see Joseph*, 309 S.W.3d at 25. And second, the waiver must have been "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis*, 560 U.S. at 382–83; *see Joseph*, 309 S.W.3d at 25. We determine whether a waiver was valid by considering the totality of the circumstances surrounding the interrogation. *Joseph*, 309 S.W.3d at 25. The totality of the circumstances includes the defendant's experience, background, and conduct. *Id.*

### 3. Discussion

As we construe his second issue, Lott argues that his waiver was invalid under Article 38.22 because it was neither voluntary nor knowing and intelligent. He also contends that his waiver was invalid under *Miranda* because it was not knowing and intelligent.

### a. Voluntary waiver of rights under *Miranda*

In his brief, Lott states that he makes "no assertion that [he] was subjected to official intimidation that would implicate a *Miranda* involuntariness claim." He further states that his involuntary-waiver argument is predicated on his assertion that his

16

mental illness rendered him unable to knowingly, intelligently, and voluntarily waive his rights against self-incrimination. Lott specifically states that his claim of involuntariness is based on his state of mind, not on any governmental intimidation, coercion, or deception. Thus, any involuntary-waiver complaint would not be governed by *Miranda*. *See Oursbourn v. State*, 259 S.W.3d 159, 171 (Tex. Crim. App. 2008) (noting that because *Miranda* protects defendants against improper government coercion, "*Miranda* claims of involuntariness generally do not require 'sweeping inquiries into the state of mind of a criminal defendant who has confessed'" and that the United States Constitution "leaves voluntariness claims based on the defendant's state of mind 'to be resolved by state laws governing the admission of evidence,'" which in Texas is Article 38.22 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986))).

### b. Voluntary waiver of rights under Article 38.22

Lott argues that his rights waiver was involuntary because the record established he had been diagnosed with schizoaffective disorder a year before his confession, rendering his confession a product not of his free and deliberate choice but of compulsions sparked by his mental illness.

Unlike a claim of involuntariness under *Miranda*, a defendant's claim that his waiver of rights under Article 38.22 was involuntary need not be predicated on evidence of police overreaching. *See Leza v. State*, 351 S.W.3d 344, 352 (Tex. Crim. App. 2011). Under the totality of the circumstances test, many factors, including the defendant's mental illness, may be relevant in determining whether a defendant's

17

waiver of rights under Article 38.22 was voluntary—the product of his free and deliberate choice. *See Oursbourn*, 259 S.W.3d at 172–73; *Williams v. State*, 502 S.W.3d 262, 272 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

To support his argument that his mental illness rendered his waiver involuntary, Lott relies heavily upon Shipley's report prepared after Lott's pretrial competency examination. He also appears to rely on the video of his custodial interrogation, which the State later introduced at trial as rebuttal evidence. But as the State points out, Shipley's report was not before the trial court during the suppression hearing—neither party introduced it into evidence, and the trial court did not take judicial notice of it. Nor did either party introduce the video of Lott's custodial interview at the suppression hearing. In determining whether the trial court's ruling on a motion to suppress is supported by the record, we generally consider only evidence adduced at the suppression hearing. *See Perez v. State*, 495 S.W.3d 374, 387 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *McQuarters v. State*, 58 S.W.3d 250, 255 (Tex. App—Fort Worth 2001, pet. ref'd). And while there is an exception to this rule when the parties consensually relitigate the suppression issue during trial, *see Perez*, 495 S.W.3d at 387; *McQuarters*, 58 S.W.3d at 255, the parties did not do so here. Accordingly, neither Shipley's report nor the video of Lott's custodial interview can factor into our analysis of the trial court's ruling on Lott's motion to suppress evidence of his confession. *See Perez*, 495 S.W.3d at 387 ("[T]his Court may only

18

consider evidence available to the trial court when it ruled on the motion to suppress.").

The evidence adduced at the suppression hearing shows that almost nineteen months after Lott's confession, the trial court determined that he was incompetent to stand trial because of mental illness. While this fact is relevant to a determination of whether Lott's waiver was voluntary, it is not conclusive. *See Umana v. State*, 447 S.W.3d 346, 357 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). Nor is it the only fact relevant to our analysis. The trial court was entitled to find Killingsworth's testimony credible, a finding that we do not second-guess. *See Wiede*, 214 S.W.3d at 24–25. Given Killingsworth's training and background, the trial court could have afforded great weight to his opinion that Lott's waiver was voluntary based on Killingsworth's first-hand observations that when Lott waived his rights and responded to questioning, Lott was speaking intelligently, was not delusional, and was not exhibiting any symptoms of someone in need of immediate mental-health assistance, Lott's statements about the devil notwithstanding. *See Umana*, 447 S.W.3d at 356 (concluding self-reported mental illness did not render statement involuntary because totality of circumstances surrounding statement revealed clear, voluntary waiver); *cf. Sebring v. State*, No. 14-13-01046-CR, 2015 WL 3917982, at *8 (Tex. App.— Houston [14th Dist.] June 25, 2015, pet. ref'd) (mem. op., not designated for publication) (concluding statement was voluntary based on officer's testimony that

appellant was quiet, coherent, clear, alert, and rational despite having taken sleep medication).

The totality of the circumstances here supported the trial court's determination that Lott's mental illness did not render him incapable of understanding the meaning and effect of his waiver and confession and, thus, that both were voluntarily made. *See Casias v. State*, 452 S.W.2d 483, 488 (Tex. Crim. App. 1970); *Routh v. State*, 516 S.W.3d 677, 702–03 (Tex. App.—Eastland 2017, no pet.); *Stinnett v. State*, 720 S.W.2d 663, 667 (Tex. App.—Amarillo 1986, no pet.).

### c. Knowing and intelligent waiver under *Miranda* and Article 38.22

Lott also contends that he did not knowingly and intelligently waive his rights under *Miranda* or Article 38.22.[4] He again points to his mental illness, claiming that the symptoms of his schizoaffective disorder rendered him unable to have a full

---

[4]The State suggests that Lott's failure to assert that his waiver of rights under *Miranda* was the product of police coercion forecloses any claim that his waiver under *Miranda* was not knowing or intelligent. But we find *Leza* instructive here. *See* 351 S.W.3d at 348–51. Leza asserted that his *Miranda* waiver had not been voluntary, knowing, and intelligent because he was under the influence of heroin at the time he made the waiver. *Id.* at 350. The court held Leza's involuntariness claim under *Miranda* was foreclosed as a matter of law because he did not assert that his waiver resulted from police coercion. *Id.* But the court also concluded that the absence of police coercion did not similarly foreclose the appellant's claim that he did not knowingly and intelligently waive his rights. *Id.* at 351. The court explained that Leza's heroin use "[had] a bearing on his comprehension" and thus was "a factor that [was] relevant to determining whether [his] *Miranda* waiver was knowing and intelligent." *Id.* Similarly, while Lott may not assert that his *Miranda* waiver was involuntary in the absence of police coercion, he may assert a claim that his *Miranda* waiver was not knowingly and intelligently made. *See id.* at 348–51.

awareness both of the nature of the rights being abandoned and of the consequences of the decision to abandon it. *See Berghuis*, 560 U.S. at 382–83; *Joseph*, 309 S.W.3d at 25. But in making this argument, Lott again relies on Shipley's report, which we cannot factor into our analysis.

To determine that Lott's waiver was knowing and intelligent, the record need only reveal that Lott at all times knew he could remain silent and was aware of the State's intention to use his statements to secure a conviction. *See Leza*, 351 S.W.3d at 349. In other words, Lott's waiver was knowing and intelligent if the record showed that he was made aware, and fully comprehended, that he had the right to remain silent in the face of police interrogation and to discontinue the dialogue at any time, and that the consequence of his waiver was that his words might be used against him later in a court of law. *See id.*

The record supports a finding that Lott was made aware of, and fully comprehended, these particular rights and consequences. Before his custodial interview, Lott received a document that spelled out these rights and consequences, and he initialed and signed that document to affirm that he had both read these warnings and comprehended them. Killingsworth read these warnings to Lott. Based on Killingsworth's experience and training and on Lott's behavior, Killingsworth believed that Lott's statement was intelligent and knowing. In view of the totality of the circumstances surrounding Lott's custodial interview, we conclude that a preponderance of the evidence supports a finding that before confessing to shooting

21

Lauren and Makayla during the custodial interview, Lott knowingly and intelligently waived his rights under *Miranda* and Article 38.22.

### III. COURT-ORDERED PSYCHIATRIC EXAMINATION

Lott argues in his third issue that the trial court erred by ordering him to submit to a pretrial psychiatric examination conducted by an expert retained by the State.

Before trial, Lott filed a notice stating his intent to assert the affirmative defense of insanity. *See* Tex. Penal Code Ann. § 8.01; Tex. Code Crim. Proc. Ann. art. 46C.051. In response, the State filed a motion asking the trial court to allow a State-retained expert to conduct a psychiatric evaluation of Lott for purposes of rebutting any expert testimony Lott would present at trial in support of his insanity defense. Lott objected to the State's request, arguing that compelling him to submit to such an examination would violate his constitutional right to be protected from compelled self-incrimination, would violate his constitutional right to due process, would violate his right to present insanity evidence without submitting to a State-sponsored examination, and would run afoul of the statutory requirement that an appointed expert be disinterested. *See* U.S. Const. amends. V, XIV; Tex. Const. art. I, §§ 10, 19; Tex. Code Crim. Proc. Ann. arts. 1.04, 1.05, 46C.101, 46C.107. In the alternative to these assertions, Lott requested that any ordered examination be limited "to omit any discussion with the defendant of the facts and circumstances of the offense." After a hearing, the trial court granted the State's motion. In doing so, the

trial court ordered that neither the prosecutors nor Lott's defense attorneys could be present during the State's expert's examination. The State retained Dr. Randall Price to examine Lott.

During his case-in-chief, Lott presented testimony from his expert, Dr. Brian Falls, who said that he had examined Lott and that his opinion was that Lott was insane when he shot Lauren and Makayla. To rebut Falls's testimony, the State called Price to the stand and, without objection from Lott, Price contradicted Falls's testimony and opined that Lott was not insane at the time of the shooting.

On appeal, Lott argues that the trial court erred by granting the State's motion because it violated the constitutional and statutory rights he asserted in his objections to the State's motion. He again raises his assertion that Price should not have been allowed to question Lott about the circumstances of the offense. He additionally argues for the first time on appeal that the ruling violated his Sixth Amendment rights. For the following reasons, we conclude that the trial court did not err by ordering Lott to submit to a psychiatric examination with Price for rebuttal purposes and overrule his third issue.

## A. PRESERVATION

We first address whether Lott preserved for our review his appellate psychiatric-examination arguments. *See Darcy v. State*, 488 S.W.3d 325, 328 (Tex. Crim. App. 2016). The State contends that Lott did not preserve any of the complaints raised in his third issue because he did not re-urge those objections when Price

23

testified at trial.[5]   Regarding Lott's trial objections based on due process, self-incrimination, the right to raise insanity without a compelled examination, and the right to a disinterested expert, Lott challenges on appeal the trial court's ruling on the State's motion for a compelled examination, not the subsequent admission of Price's testimony.  *Cf. Estelle v. Smith*, 451 U.S. 454, 461 (1981) (addressing whether trial court's admission of testimony of expert, who performed a court-ordered psychiatric examination, violated defendant's constitutional privilege against self-incrimination); *Darcy*, 488 S.W.3d at 329 (distinguishing right to counsel at critical stage of trial, which is a waivable-only right, from the right to prevent the admission of evidence obtained in violation of the right to counsel, which is a forfeitable right); *State v. Santistevan*, 148 P.3d 1273, 1275 (Idaho Ct. App. 2006) (addressing whether "compelled mental examination is a *per se* violation of [a defendant's] constitutional privilege against self-incrimination").  By granting the State's motion, the trial court implicitly overruled Lott's objections.  *See* Tex. R. App. P. 33.1(a)(2)(A).  These arguments were, therefore, preserved for our review.  *See Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013).

Lott asserts on appeal that the court-ordered psychiatric examination with Price violated his rights to confrontation and to the assistance of counsel.  *See* U.S. Const.

---

[5]We agree with the State that Lott's failure to object to Price's testimony at trial could factor into an analysis of whether any error in the trial court's order was harmful, but harm is a separate question from whether Lott preserved any error in that ruling.  *Compare* Tex. R. App. P. 33.1(a), *with* Tex. R. App. P. 44.2.

amend. VI. The confrontation right is forfeitable and, thus, subject to the rules of preservation. *See Davis v. State*, 313 S.W.3d 317, 347 (Tex. Crim. App. 2014); *Robinson v. State*, 310 S.W.3d 574, 577 (Tex. App.—Fort Worth 2010, no pet.). Lott did not object to the State's request for a court-ordered psychiatric examination on confrontation grounds, failing to preserve this complaint for our review. *See* Tex. R. App. P. 33.1(a); *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005). But Lott did not forfeit his appellate assistance-of-counsel argument by not objecting to the court-ordered psychiatric examination based on the Sixth Amendment right to counsel. *See Gilley v. State*, 418 S.W.3d 114, 119 (Tex. Crim. App. 2014); *see also Darcy*, 488 S.W.3d at 329. The Sixth Amendment right to the assistance of counsel is a waivable-only right that cannot be surrendered by mere inaction.[6] *See Darcy*, 488 S.W.3d at 329; *Gilley*, 418 S.W.3d at 119.

Lott also contends on appeal as he did in the trial court that Price should not have been allowed to elicit "any statements regarding the crimes for which [Lott] was charged," which is an argument directed to the admission of Price's testimony about Lott's statements during the examination.[7] Lott asserts that because the State already had Lott's confession and because Price had Lott's phone calls from jail and his prior

[6]By contrast, however, the right to prevent the admission of evidence that was obtained in violation of the right to counsel is a forfeitable right that must be preserved at trial. *See Darcy*, 488 S.W.3d at 329.

[7]Indeed, Lott asserts that the absence of such limits on Price's examination "hindered defense counsel's cross[-]examination at trial."

25

psychological records, "[t]here was no need for the expert to extract more information from Lott regarding the offenses."[8] But Price was specifically tasked with determining Lott's sanity at the time of the offenses to rebut Lott's insanity defense. Such a determination necessarily would require Price to question Lott about the surrounding circumstances of the offenses. *See United States v. Leonard*, 609 F.2d 1163, 1165 (5th Cir. 1980) ("[P]sychiatrists would not be able to obtain reliable testimony [on the issue of sanity] unless they were free to inquire into the prior conduct of the defendant, including his participation in the criminal activity with which he is charged."). Lott's remedy to exclude such statements from the jury's consideration would have been to object to Price's testimony regarding the circumstances of the offense on the basis of the Fifth Amendment.[9] *See United States v. Cohen*, 530 F.2d 43, 47–48 (5th Cir. 1976) (recognizing eliciting inculpatory statements at compulsory examination is not unconstitutional per se because any statement about the offense itself may be excluded). This he did not do, thereby failing to preserve any error in the admission of Lott's inculpatory statements to Price, partially forming the basis of Price's sanity opinion. *See* Tex. R. Evid. 103(a)(1); *In re Commitment of Petersimes*, 122 S.W.3d 370, 372–73 (Tex. App.—Beaumont 2003, pet. denied).

---

[8]Price testified that he relied on this information as well as his examination of Lott to reach his expert opinion.

[9]The record reflects that Price prepared a report, which the State produced to Lott before Price testified. The report was not admitted into evidence.

26

Finally, we recognize that Lott has not separately briefed his due-process and self-incrimination appellate arguments based on the United States Constitution from his arguments based on the Texas Constitution or on the Code of Criminal Procedure. And he has not asserted that these state grounds afford him greater protection than the United States Constitution does. Accordingly, we need not address these particular state-law arguments separately from Lott's federal constitutional arguments.[10] *See Lilly v. State*, 365 S.W.3d 321, 326 (Tex. Crim. App. 2012); *Merrick v. State*, 567 S.W.3d 359, 365 (Tex. App.—Fort Worth 2018, pet. ref'd).

## B. SELF-INCRIMINATION

Lott complains that by compelling him to submit to Price's psychiatric examination, the trial court violated his privilege against self-incrimination. Both Lott and the State suggest that there are no Texas cases addressing the specific complaint Lott raises here. While that may be true, the court of criminal appeals has addressed claims similar to Lott's in what we conclude is an analogous context—the use of psychiatric examinations on the issue of a defendant's future dangerousness during the punishment phase of a capital-murder case. *See, e.g.*, *Wilkens v. State*, 847 S.W.2d 547, 552 (Tex. Crim. App. 1992).

In *Soria v. State*, the court of criminal appeals, in a lengthy analysis and applying Supreme Court precedent, held that

---

[10]Lott did provide separate argument concerning Chapter 46C of the Code of Criminal Procedure; thus, we will address that contention.

27

when the defendant initiates a psychiatric examination and based thereon presents psychiatric testimony on the issue of future dangerousness, the trial court may compel an examination of appellant by an expert of the State's or court's choosing and the State may present rebuttal testimony of that expert based upon his examination of the defendant; provided, however, that the rebuttal testimony is limited to the issues raised by the defense expert.

933 S.W.2d 46, 57–58 (Tex. Crim. App. 1996) (footnotes omitted). The court expanded the scope of that holding in *Lagrone v. State*, holding that trial courts may "order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, *or plans to introduce*, its own future dangerousness expert testimony." 942 S.W.2d 602, 611 (Tex. Crim. App. 1997). The *Lagrone* court noted that *Soria* had been "based upon the premise that 'a defendant waives his Fifth Amendment rights to a limited extent by presenting psychiatric testimony on his behalf'" and "explained that the 'introduction by the defense of psychiatric testimony based upon an examination of the defendant constitute[s] a waiver of the defendant's Fifth Amendment privilege *in the same manner as would the defendant's election to testify at trial*.'" *Id.* at 610–11 (quoting *Battie v. Estelle*, 655 F.2d 692, 701–02 (5th Cir. 1981) and *Soria*, 933 S.W.2d at 53–54).

The court also recognized that forbidding a trial court from ordering a psychiatric examination on the issue of future dangerousness until after the defense has already presented his own expert testimony on that issue was "bound to work against the State in almost every case" because by that point, the defendant, having already reaped the benefit of his own expert's testimony, could simply fail to

cooperate with the State's expert. *See id.* at 611. The court held that its "sense of justice [would] not tolerate allowing criminal defendants to testify through [a] defense expert and then use the Fifth Amendment privilege against self-incrimination to shield themselves from cross-examination on the issues which they have put in dispute." *Id.*

We fail to see why the court of criminal appeals' holdings in *Soria* and *Lagrone* would not apply here. And the federal courts have uniformly held that where a defendant raises a mental-status defense such as insanity during the guilt-innocence phase of trial, the constitution does not prohibit a trial court from ordering the defendant to undergo a psychiatric examination for the limited purpose of rebutting the asserted defense. *See United States v. Byers*, 740 F.2d 1104, 1111 (D.C. Cir. 1984) (plurality opinion) (collecting cases); *Cohen*, 530 F.2d at 47 (holding "compelled psychiatric examination [may be ordered] when a defendant has raised the insanity defense"); *see also Kansas v. Cheever*, 571 U.S. 87, 94 (2013) ("[W]here a defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence in rebuttal.").

Here, the trial court ordered Lott to submit to a psychiatric examination with Price only after Lott filed notice that he intended to raise insanity. Given that fact, and based on the above authorities, we conclude that the trial court did not violate Lott's Fifth Amendment privilege against self-incrimination by ordering him to submit to that examination to rebut Lott's insanity defense.

29

## C. ASSISTANCE OF COUNSEL AND DUE PROCESS

Lott contends that the trial court violated his Sixth Amendment right to assistance of counsel by ordering that his attorney could not be present during his examination with Price and by failing to provide formal notice of the date and scope of the examination. Liberally construing his brief, we determine that Lott argues these failures also violated his right to due process under the Fourteenth Amendment. *See* Tex. R. App. P. 38.9.

We first consider Lott's contention that he had a Sixth Amendment right to have his counsel present at the examination and that counsel's absence deprived Lott of due process. As we did with Lott's Fifth Amendment argument, we find applicable here the court of criminal appeals' analysis of similar claims concerning the use of psychiatric examinations on the issue of a defendant's future dangerousness during the punishment phase of a capital-murder trial. The court of criminal appeals has held that a psychiatric examination is not an adversary proceeding; rather, its sole purpose is to enable an expert to form an opinion as to some aspect of an accused's mental state. *Stultz v. State*, 500 S.W.2d 853, 855 (Tex. Crim. App. 1973); *see also In re State*, No. 08-18-00102-CR, 2019 WL 3001520, at *3 n.2 (Tex. App.—El Paso July 10, 2019, orig. proceeding). And "[b]ecause of the intimate, personal[,] and highly subjective nature of a psychiatric examination, the presence of a third party in a legal and non-medical capacity would severely limit the efficacy of the examination." *Bennett v. State*, 766 S.W.2d 227, 231 (Tex. Crim. App. 1989) (quoting *Stultz*,

500 S.W.2d at 855); *see State*, 2019 WL 3001520 at *3 n.2. For these reasons, a defendant does not have a Sixth Amendment right to have counsel present during a psychiatric examination. *See Bennett*, 766 S.W.2d at 231; *see also Cohen*, 530 F.2d at 48; *State*, 2019 WL 3001520, at *3 n.2.

Lott additionally contends that the Sixth and Fourteenth Amendments required the trial court to give him formal notice of when the examination would occur and a description of the topics that would be covered. *See Byers*, 740 F.2d at 1119 (distinguishing claim that barring defense counsel from attending a defendant's court-ordered psychiatric examination violates the Sixth Amendment from a claim that a trial court's failure to provide defendant's counsel with notice of such an examination violates the Sixth Amendment). Lott apparently relies on *Smith*, in which the Supreme Court concluded that the trial court's failure to provide advance notice to the defendant's counsel that the court-ordered psychiatric examination would encompass the issue of the defendant's future dangerousness deprived the defendant of his Sixth Amendment right to the assistance of counsel. 451 U.S. at 471. But *Smith* involved a situation where the defendant did not assert a mental-status defense such as insanity and did not offer psychiatric evidence at trial; Lott raised insanity as a defense and ultimately offered psychiatric evidence from his own expert at trial. *Id.* at 465–66. But even assuming that distinction is not critical, *Smith* is distinguishable on another basis.

The constitutional problem in *Smith* was that the defendant's attorneys were not notified that the examination would encompass the issue of future dangerousness. *Id.* at 465, 470–71. Here, by contrast, the record shows that Lott's attorneys knew the purpose, scope, and possible timing of the examination before it took place: (1) Lott gave notice of his intent to raise the defense of insanity at trial; (2) the State filed a motion seeking an independent psychiatric examination of Lott expressly for the purpose of rebutting Lott's insanity defense; (3) Lott's attorneys filed a written response and objection to the State's motion indicating their understanding that the State sought the examination to rebut Lott's insanity defense; (4) the trial court held a hearing, which Lott's attorneys attended and at which the State both reiterated that its request was for an independent examination of Lott for purposes of rebutting his insanity defense and requested that the examination take place five days after the hearing; and (5) the trial court signed an order granting the State's motion. Accordingly, Lott's counsel's awareness before the court-ordered examination occurred that the examination would encompass Lott's sanity at the time of the shooting for purposes of rebutting his insanity defense distinguishes this case from *Smith*.

We are therefore unpersuaded by Lott's contention that his attorneys lacked notice of the purpose and scope of his examination with Price before it occurred; thus, there was no assistance-of-counsel or due-process violation.[11]

## D.  CHAPTER 46C

Finally, Lott complains that the court-ordered examination violated Chapter 46C of the Code of Criminal Procedure.  As he did in the trial court, Lott focuses specifically on Article 46C.101, which provides in relevant part that when a defendant files a notice of intention to raise the insanity defense, "the court may, on its own motion or motion by the defendant, the defendant's counsel, or the attorney representing the state, appoint one or more disinterested experts to . . . examine the defendant with regard to the insanity defense."  Tex. Code Crim. Proc. Ann. art. 46C.101(a)(1).  Lott contends that this provision constrains a trial court's discretion by permitting appointment only of a disinterested expert.  Because Price was the State's retained expert, Lott asserts that Price did not qualify as a disinterested expert; thus, Lott contends that the trial court abused its discretion by granting the State's motion.

---

[11]Further, Lott appears to contend that the trial court should have ordered that the examination with Price be recorded by video.  But the record does not show that he ever made that request in the trial court, and thus he failed to preserve any error in the trial court's failure to order that the examination be videotaped.  *See* Tex. R. App. P. 33.1(a).

As the trial court found in a letter ruling on the State's motion, Article 46C.101(a)(1)'s language is permissive. Neither party has cited us to any directly applicable authority construing Article 46C.101(a)(1), but we find guidance in decisions from the court of criminal appeals construing Article 46C.101(a)'s predecessor—former Code of Criminal Procedure Article 46.03, Section 3(a). *See* Act of May 18, 1977, 65th Leg., R.S., ch. 596, § 2, art. 46.03, sec. 3(a), 1977 Tex. Gen. Laws 1467, 1467–68 (repealed 2005); *Pham v. State*, 463 S.W.3d 660, 670 (Tex. App.— Amarillo 2015, pet. ref'd). Like current Article 46C.101(a)(1), former Article 46.03 provided that if a defendant gives notice of intent to raise insanity as a defense, the trial court "may" appoint "disinterested experts" to examine the defendant on that issue. Act of May 18, 1977, 65th Leg., R.S., ch. 596, § 2, art. 46.03, sec. 3(a), 1977 Tex. Gen. Laws 1467, 1467–68 (repealed 2005).

In *Brandon v. State*, the appellant contended, as Lott does here, that this statute provided the exclusive procedure by which a defendant could be examined as to his sanity and that, consequently, his examination by State-selected experts was unlawful. 599 S.W.2d 567, 576 (Tex. Crim. App. 1979), *vacated on other grounds*, 453 U.S. 902 (1981). The court recognized that it had "held that [former Articles 46.02 and 46.03] did not provide the exclusive procedure for examining the defendant, and consequently the State's rebuttal testimony was proper even though [the State's expert] was not court-appointed and had examined the defendant solely at the State's

34

request." *Id.* The court reasoned that the same was true of former Article 46.03's provisions, holding that

> appellant was entitled to call his own expert witnesses to testify that he was insane at the time of the commission of the offense and the State was entitled to rebut that testimony with its own expert witnesses. These witnesses need not be court-appointed and are not subject to the above-mentioned specific provisions of [Articles 46.02 and 46.03] that court-appointed psychiatrists are subject to.

*Id.*; *see also Patterson v. State*, 509 S.W.2d 857, 861–62 (Tex. Crim. App. 1974). In light of the similar phrasing in Article 46C.101(a)(1), Lott has failed to persuade this court that the court of criminal appeals' construction of its predecessor statute would not apply here. *See Pham*, 463 S.W.3d at 670. *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322–26 (2012) (noting, under prior-construction canon, "when a statute uses the very same terminology as an earlier statute—especially in the very same field . . .—it is reasonable to believe that the terminology bears a consistent meaning"). Accordingly, we conclude that the trial court did not violate Article 46C.101(a)(1) by ordering Lott to submit to an examination by the State's retained expert.

## IV. VICTIM-IMPACT AND VICTIM-CHARACTER EVIDENCE

In Lott's fourth and final issue, he complains that the trial court abused its discretion by admitting the testimony of Vern Landavazo, Lauren's father, and Shemeka Smith, Makayla's mother, during the punishment phase. He argues that their testimony amounted to highly prejudicial victim-impact and victim-character

evidence that had limited probative value, rendering it inadmissible under Rule 403. Tex. R. Evid. 403.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

We review a trial court's ruling admitting victim-impact or victim-character evidence during the punishment phase of trial for an abuse of discretion. *Mays v. State*, 318 S.W.3d 368, 392 (Tex. Crim. App. 2010); *see Douglas v. State*, Nos. 02-15-00445-CR, 02-15-00446-CR, 2017 WL 444381, at *7 (Tex. App.—Fort Worth Feb. 2, 2017, pet. ref'd) (mem. op., not designated for publication). Under that standard, we will uphold the trial court's ruling as long as it lies within the zone of reasonable disagreement and is correct under any theory of law applicable to the case. *See Kirk v. State*, 421 S.W.3d 772, 782 (Tex. App.—Fort Worth 2014, pet. ref'd).

Code of Criminal Procedure Article 37.07 provides that any evidence that the trial court "deems relevant to sentencing" is admissible during the punishment phase of a trial. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1); *Sims v. State*, 273 S.W.3d 291, 295 (Tex. Crim. App. 2008). Lott does not argue that the victim evidence was not relevant. Indeed, because such evidence had some bearing on Lott's personal responsibility and moral culpability, it was relevant punishment evidence. *See Salazar v. State*, 90 S.W.3d 330, 335 (Tex. Crim. App. 2002).

But even if deemed relevant, such evidence is nonetheless subject to Rule 403's weight inquiry—whether the probative value is substantially outweighed by a danger of unfair prejudice. Tex. R. Evid. 403; *see Salazar*, 90 S.W.3d at 335; *Gilbert v. State*,

36

575 S.W.3d 848, 871 (Tex. App.—Texarkana 2019, pet. ref'd). Thus, when considering the admissibility of victim evidence, a trial court must carefully consider four factors: "(1) how probative is the evidence; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Salazar*, 90 S.W.3d at 336; *accord Gilbert*, 575 S.W.3d at 871.

## B. PRESERVATION

Before the punishment hearing and outside the jury's presence, Lott's counsel stated that he understood the State intended to call a family member of each victim to testify. Lott's counsel objected, "We object to the testimony under 403 and under . . . the Salazar factors and also under the Eighth Amendment."[12] The State responded by confirming that it intended to call Landavazo and Smith to provide victim-impact evidence. Lott's counsel replied, "Your Honor, should the Court overrule our objection, we would request a running objection." The trial court overruled the objection but added that Lott could "have a running objection during the testimony of the family witnesses."

To preserve a complaint for our review, the complaining party must make a timely objection in the trial court. *See* Tex. R. App. P. 33.1(a)(1); Tex. R. Evid. 103(a)(1)(A). An objection is considered timely if it is made when the ground for the

---

[12]Lott does not raise an Eighth Amendment argument on appeal.

37

objection becomes apparent. *See Neal v. State*, 256 S.W.3d 264, 279 (Tex. Crim. App. 2008). If the ground for the objection has not yet arisen, the objection is premature, and the trial court properly overrules the objection on that basis. *See Canales v. State*, 98 S.W.3d 690, 699 (Tex. Crim. App. 2003); *Felder v. State*, 848 S.W.2d 85, 96 (Tex. Crim. App. 1992); 43A George E. Dix & John M. Schmolesky, *Texas Practice: Criminal Practice & Procedure* § 53:61 (3d ed. 2019); *cf. Watts v. Adviento*, No. 02-17-00424-CV, 2019 WL 1388534, at *7 (Tex. App.—Fort Worth Mar. 28, 2019, no pet.) (per curiam) (mem. op.) (holding in appeal from protective order that "prejudicial" objection lodged before witness began testimony was premature and, thus, did not preserve error). "The lesson is that an appellant must have sought relief from the trial judge at the time when the full picture relied upon on appeal was before the trial judge. Only then did the request give the trial judge an adequate opportunity to understand and avoid the error." Dix & Schmolesky, *supra*, at § 53:61.

Here, Lott objected before any evidence was proffered at the punishment phase. Although the trial court was aware that the State intended to call two family members to give victim-impact testimony, there was no context by which the trial court could conduct a meaningful balancing test under Rule 403. And the running objection did not solve this issue because it too was untimely and was granted in the absence of context. *See Sattiewhite v. State*, 786 S.W.2d 271, 283 n.4 (Tex. Crim. App. 1989) (holding that "as long as the running objection constituted a **timely** objection, stating the specific grounds for the ruling, [and] the movement [the appellant] desired

38

the court to make . . . then the error should be deemed preserved by an appellate court" (emphasis added)); *cf. Cole v. State*, 987 S.W.2d 893, 895 (Tex. App.—Fort Worth 1998, pet. ref'd) (holding if appellant does not object to evidence, later request for a running objection to same evidence will not preserve error); *Elliff v. State*, No. 05-07-01434-CR, 2008 WL 5158930, at *2 (Tex. App.—Dallas Dec. 10, 2008, no pet.) (not designated for publication) ("Appellant did not object to [the expert's] testimony when it was offered at trial. Before the testimony, appellant was allowed a running objection based on his earlier complaint about the 'admissibility of [the expert's] testimony.' This general running objection, however, did not preserve his current complaint for appeal."). *See generally White v. State*, 784 S.W.2d 453, 460 (Tex. App.—Tyler 1989, pet. ref'd) (op. on reh'g) (recognizing determination of whether running objection preserves error is dependent on particular facts and circumstances of each case).

We conclude that Lott's Rule 403 objection and running objection were premature and did not preserve any error for our review. *See Salazar*, 90 S.W.3d at 337 ("It is . . . difficult for a trial judge to weigh the probative value against the potentially unfair prejudice of a particular item of evidence without first reviewing it."); *cf. Ford v. State*, 919 S.W.2d 107, 112–13 (Tex. Crim. App. 1996) (holding defendant preserved Rule 403 objection to second witness's victim-impact testimony when earlier request for running Rule-403 objection made and granted during context of first witness's similar victim-impact testimony); *Scranton v. State*, No. 2-09-242-CR,

39

2010 WL 2721483, at *5 (Tex. App.—Fort Worth July 8, 2010, pet. ref'd) (per curiam) (mem. op., not designated for publication) (same). But even if Lott had preserved this complaint for our review, we would conclude for the following reasons that the trial court did not abuse its discretion by admitting this evidence.

## C. No Abuse of Discretion

### 1. Smith's Testimony

Lott challenges Smith's testimony as unfairly prejudicial victim-impact and victim-character evidence. Smith testified that Makayla called her and was screaming and crying that someone had shot her. Smith drove to the scene while still talking to her daughter on the phone. When she arrived, however, she lost contact with Makayla. Smith then looked in the alley and saw the bottom of Lauren's shoes. She testified that she believed the shoes were Makayla's: "[A]t first I thought it was [Makayla] and I just lost it. And I didn't know what to do. I was told later on that I had fell to the ground and the officers had to help me up." An officer walked Smith to the front of an ambulance and on the way, she looked down the alley, yelled for Makayla, and saw an arm reach up. Smith said that she assumed it was Makayla. Smith also testified to her thoughts about and reaction to the shooting: "[T]hat whole day was just like a scene out of a movie. And I was like how is this happening. How is this happening to two good families, good people, and something this horrible, we were actually living it." And she stated that Makayla thinks of others first "all the time." Finally, Smith testified that while she was in the hospital's waiting room, she

40

heard Lauren's mother scream. Smith stated that she remembered the scream because it was obvious that Lauren had died and that Smith could do nothing to help.

The first *Salazar* factor applicable to Lott's Rule 403 argument is to assay the probative value of the testimony. Victim-impact evidence is designed to remind the jury that a defendant's crime has foreseeable consequences to the community and the victim's family members and friends. *See Salazar*, 90 S.W.3d at 335. We disagree with Lott's contention that Smith's reference to the fact that the crime had happened "to two good families" and to "good people" drew an improper comparison between Makayla and other members of society based on Makayla's worth or morality. *See generally Hayden v. State*, 296 S.W.3d 549, 552 (Tex. Crim. App. 2009) ("[E]vidence that draws comparisons between the victim and other members of society based on the victim's worth or morality should usually be excluded under Rule 403."). Rather, the statements themselves, as well as the context in which they were given, demonstrated the shooting's direct impact on Makayla's family and the immediate effect of the random shooting on them. Thus, Smith's testimony was probative of the issue of the shooting's foreseeable consequences. *See Gilbert*, 575 S.W.3d at 872.

As to the second *Salazar* factor, Lott focuses on Smith's testimony about Lauren's mother's scream at the hospital and argues that this testimony had significant potential to impress the jury in an irrational and indelible way. But Smith simply described that event, and we find nothing about that description or her other testimony that was likely to impress the jury in an irrational and indelible way. *See id.*

41

As to the third *Salazar* factor, Lott argues the State took an inordinate amount of time to elicit Smith's victim-impact testimony because it spanned fourteen of the approximately forty-six total pages of punishment testimony. *See Salazar*, 90 S.W.3d at 336 (quoting *Mosley v. State*, 983 S.W.2d 249, 262–63 (Tex. Crim. App. 1998) for proposition that victim-impact and victim-character evidence can become unfairly prejudicial through sheer volume). However, Smith was the only witness who testified as to the shooting's impact on Makayla's family, and we conclude on this record that this testimony was not unfairly prejudicial based on its length. *See, e.g.*, *Mole v. State*, No. 2-08-021-CR, 2009 WL 1099433, at *14 (Tex. App.—Fort Worth Apr. 23, 2009, pet. ref'd) (mem. op., not designated for publication) (concluding victim-impact and victim-character testimony of three witnesses spanning a total of twenty pages not prejudicial by volume).

Finally, Lott contends the fourth factor weighs against admissibility of Smith's testimony because it was cumulative of evidence admitted during the guilt-innocence phase of trial and because it "delved too far into moral comparisons and emotional pleas." But Smith's victim-impact testimony was neither cumulative of any other admitted evidence nor unduly emotional.

Applying the *Salazar* factors, we conclude the trial court did not abuse its decision by admitting Smith's victim-impact and victim-character testimony over Lott's Rule 403 objection. *See id.*

## 2. Landavazo's Testimony

Lott challenges two aspects of Landavazo's testimony: (1) his statements regarding Lauren's childhood (victim-character evidence) and (2) his statements about his arrival at the scene and riding in the ambulance with Lauren (victim-impact evidence).

Landavazo testified about his joy at Lauren's birth. He stated that he had always thought he would have a girl and that when she was born, he realized how special and beautiful she was. As Lauren grew up, Landavazo noticed that she "seemed so much wiser than her years" and that she had an outsized capacity for compassion, kindness, and tenderness. He related a specific occasion when three-year-old Lauren exhibited empathy for a sick relative. He said that Lauren was kind to others and would befriend new students at her school. Landavazo also testified that Lauren loved to sing along to children's songs.

Landavazo testified that while he was on his way to the crime scene, he called Lauren's phone but that someone else answered it. He immediately heard Lauren's mother screaming in the background and he "instantly went cold and [he] just knew." Landavazo also testified that he was allowed to ride in the ambulance with Lauren. He stated that during the ambulance ride, he saw blood in Lauren's hair and thought, "[O]h my God, that's not -- that's not good, blood in her hair."

Lott concedes that Landavazo's testimony about the shooting scene and ambulance ride was probative of the impact the shooting had on Lauren's family. But

43

he argues Landavazo's testimony about Lauren's childhood was not probative victim-character evidence. Victim-character evidence is designed to give the jury "a quick glimpse of the life that the petitioner chose to extinguish, to remind the jury that the person whose life was taken was a unique human being." *Salazar*, 90 S.W.3d at 335 (quoting *Payne v. Tennessee*, 501 U.S. 808, 830–31 (1991) (O'Connor, J., concurring)).

In *Salazar*, the court of criminal appeals held that "a seventeen-minute video montage of photographs depicting [an adult] murder victim's life, set to music from the movie *Titanic*," depicting the victim as an infant, toddler, or small child, placed "undue emphasis on the adult victim's halcyon childhood" and had little probative value as victim-character evidence. *Id.* at 332, 337. The court did not hold that evidence of a victim's childhood could never have probative value. To the contrary, the court noted that the victim's parents both testified about their "love for [the victim], his individuality, *his childhood and youth*, his love of life, and their personal loss and grief," and concluded that this testimony was "fully admissible." *Id.* at 337 (emphasis added). Landavazo's limited testimony about Lauren's childhood was probative because it gave the jury insight into her uniqueness. *See id.* at 335, 337.

Nor does Lott persuade us that the challenged portions of Landavazo's testimony presented a great risk of impressing the jury in an irrational and indelible way—the second *Salazar* factor. Lott contends Landavazo's testimony concerning Lauren's childhood, like the video montage in *Salazar*, carried with it the implicit suggestion that he had murdered an angelic infant. *See id.* at 337. But Landavazo's

44

limited testimony concerning Lauren's childhood was not like the *Salazar* video, but was the admissible testimony of a victim's parent. *See id.* at 337–39. And contrary to Lott's assertion, Landavazo's testimony concerning his arrival at the crime scene and the ambulance ride simply described the shooting's impact on him. We find nothing about his description that was likely to impress the jury in an irrational and indelible way. *See Gilbert*, 575 S.W.3d at 872.

As to the third *Salazar* factor, Lott contends the State took an inordinate amount of time to present Landavazo's victim-impact and victim-character testimony. Lott is correct that Landavazo's testimony spanned approximately thirty-two of the forty-six total pages of punishment testimony. However, Landavazo testified to more than victim-impact and victim-character evidence; he also testified to the events of the day that he personally observed. Landavazo testified about arriving at the scene of the shooting to see his daughter lying on the ground with his wife screaming, and he described how he was allowed to accompany her on the ambulance ride to the hospital and the efforts the medical personnel took to sustain his daughter's life. Landavazo's personal account of these events does not amount to victim-impact or victim-character evidence, but constituted circumstances of the offense. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1); *Miller-El v. State*, 782 S.W.2d 892, 896 (Tex. Crim. App. 1990); *Espinosa v. State*, 194 S.W.3d 703, 711 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *DeLarue v. State*, 102 S.W.3d 388, 404 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). Landavazo's remaining testimony, addressing

45

the effect of Lauren's death on her family and Lauren's unique characteristics, was not so lengthy based on volume alone that we can conclude it was inadmissible on that basis. *See Salazar*, 90 S.W.3d at 336, 338; *see, e.g.*, *Mole*, 2009 WL 1099433, at *14 (concluding victim evidence from several witnesses spanning a total of twenty pages not prejudicial by volume); *Patterson v. State*, No. 05-05-00695-CR, 2006 WL 1985960, at *5 (Tex. App.—Dallas July 18, 2006, pet. ref'd) (mem. op., not designated for publication) (concluding victim evidence spanning six pages not prejudicial by volume); *Williams v. State*, 176 S.W.3d 476, 483 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (concluding victim evidence spanning seven pages not prejudicial by volume).

Finally, Lott contends that the fourth factor weighs against the admissibility of Landavazo's testimony for the same reason it weighed against the admissibility of Smith's—it was cumulative of other evidence. But the evidence admitted at the guilt-innocence phase of trial did not describe the impact Lauren's death had on her family or Lauren's character to the jury, which are the purposes of victim-impact and victim-character evidence. *See Salazar*, 90 S.W.3d at 335; *Gilbert*, 575 S.W.3d at 871. Thus, Lott has not shown Landavazo's testimony was cumulative and, thus, inadmissible.

Applying the *Salazar* factors, we conclude the trial court's decision to admit Landavazo's testimony was not an abuse of discretion. *See Kirk*, 421 S.W.3d at 782. We overrule issue four.

## V.  CONCLUSION

Having overruled all of Lott's issues, we affirm the trial court's judgments.  *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

Lee Gabriel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  November 7, 2019